LOCAL LODGE 1297, INTERNATIONAL ASSOCIATION OF MACHINISTS &
AEROSPACE WORKERS ET AL., APPELLANTS, *v.*
ALLEN ET AL., APPELLEES.

[Cite as Local Lodge 1297 *v.* Allen (1986), 22 Ohio St. 3d 228.]

(No. 85-176—Decided March 19, 1986.)

*Gaines & Stern Co., L.P.A.,* and *David Roloff,* for appellants.

*Calhoun, Benzin, Kademenos & Heichel* and *James A. Calhoun, National Right to Work Legal Defense Foundation, Inc.* and *Glenn M. Taubman,* for appellees.

CLIFFORD F. BROWN, J. This appeal requires us to review a jury verdict which dealt with the Union's claims for fines and certain union members' counterclaims for invasion of privacy and intentional infliction of emotional distress. We address those issues in reverse order.

I

The first issue for review is the lawfulness of the jury's verdict on the various counterclaims. By their counterclaims, defendants sought to state claims against the Union and several union officers, *inter alia,* for invasion of privacy and intentional infliction of emotional distress. The trial court granted judgment on the jury's verdict against the Union and its officers as to all such claims, and the court of appeals affirmed. In support of these purported claims, counterclaimants (appellees) offered two types of evidence: evidence that several counterclaimants suffered certain property damage; and evidence that all counterclaimants had suffered verbal abuse related to their crossing of the Union's lawful picket line. The Union and its officers (appellants) urge, on several bases, that the judgment is contrary to law. In essence, appellants first claim that the vast majority of evidence of verbal abuse constituted the mere use of the epithet "scab," which is federally protected speech, and second, appellants claim that insufficient evidence was presented to link any property damage to the Union or any of its officers.

At the outset, appellants admit that they failed to raise below any argument that their speech was federally protected. Appellees strongly urge this court to decline review on that basis here. However, where, as here, the record reveals that the overwhelming majority of evidence presented to the jury consisted of federally protected speech, the failure of both the trial and appellate courts to recognize the character of the evidence is, as appellants insist, plain error which requires review by this court to remedy a manifest miscarriage of justice. *State* v. *Long* (1978), 53 Ohio St. 2d 91 [7 O.O.3d 178]; *Reichert* v. *Ingersoll* (1985), 18 Ohio St. 3d 220.

Thus, the threshold issue is whether use of the epithet "scab" may underpin a state tort action. In *Old Dominion Branch No. 496* v. *Austin*

(1974), 418 U.S. 264, non-union letter carriers brought a libel action against local and national letter carrier unions based on union publications which labeled the plaintiffs as "scabs." The United States Supreme Court overturned judgments in favor of the non-union letter carriers, holding that use of the epithet "scab" was protected by federal law. The court observed that Section 7 of the NLRA protects a union's freedom of speech, particularly in an organizational context. Thus, although *Linn* v. *United Plant Guard Workers* (1966), 383 U.S. 53, held that federal labor law does not completely pre-empt the application of state laws to libels published during labor disputes, such state tort actions simply cannot be founded upon use of language which is federally protected, such as the epithet "scab." In the words of the court: "[i]t should be clear that the newsletter's use of the epithet 'scab' was protected under federal law and cannot be the basis of a state libel judgment. * * * To be sure, the word is most often used as an insult or epithet. But *Linn* recognized that federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point." *Old Dominion*, at 282-283. In *Farmer* v. *United Brotherhood of Carpenters & Joiners* (1977), 430 U.S. 290, 305-306, the court further observed that "* * * [t]he potential for undue interference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts. * * *"

When this court recognized torts for invasion of privacy and for intentional infliction of emotional distress, we emphasized that not every indignity would be actionable. Because it arose in the context of a labor dispute, our opinion in *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, is particularly instructive. There, at 375, we observed that " '* * * liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. * * *' " Certainly, appellees must be required to endure the use of language which enjoys federal protection. Therefore, we hold that although the National Labor Relations Act does not pre-empt a state's recognition of causes of action for intentional infliction of emotional distress or invasion of privacy, neither cause of action may be predicated on the mere use of federally protected language in the context of a labor dispute. See *Farmer, supra.*

Appellees' assertion that the language at issue lost its protected character at the end of the strike is also without merit. The term "labor dispute," as defined in Section 152(9), Title 29, U.S. Code, is certainly broad enough to encompass the name-calling in this case. Much as a glass

of water may be viewed by some as half-full and by others as half-empty, what appellees would characterize as post-strike activity, appellants insist is ongoing organization in preparation for future contract negotiations. This court recognizes that to be repeatedly called a "scab" is, to say the least, unpleasant. However, in a union context, that name-calling simply does not rise to an actionable tort.

Appellees would argue that this case does not present an issue of pure speech; rather, the Union's conduct of shrieking and jeering, coupled with frequent threats and property damage, together form the basis of appellees' tort action. The record belies appellees' argument. The overwhelming majority of testimony regarding this "shrieking and jeering" involves use of the federally protected epithet "scab." The remainder of the record is legally insufficient to support either of appellees' causes of action.

Appellants admit that several appellees suffered from incidents of property damage. However, appellees have provided no direct evidence which links the union to that damage, nor which shows that the Union or its officers authorized, condoned, or ratified such incidents of actual property damage. The most that appellees proved was that after appellee Stephen Glass accepted a new job as a police officer, the Union sent a letter to the Fraternal Order of Police, in which the Union characterized Glass as a "scab." However, appellees' argument that such letter was designed to get Glass fired falls of its own weight. It should be obvious that the Fraternal Order of Police was legally incapable of affecting Glass' continued employment as a police officer. Clearly, once the voluminous record references to the word "scab" are eliminated, the remaining record is legally insufficient to support an action against either the Union or its individual officers on any of the theories presented. Thus, the counterclaims simply fail as a matter of law to establish by proof a right to relief.

Therefore, because appellees' proof was legally insufficient, the trial court erred by submitting to the jury the counterclaims for invasion of privacy and intentional infliction of emotional distress. Accordingly, to cure that error, the trial court should have granted judgment notwithstanding the verdict as to those issues.

## II

The second issue for review is whether the trial court's judgment against the Union as to its original complaint is contrary to law. Federal law permits an employer to enter into a collective bargaining agreement that requires as a condition of employment membership in a labor organization. Section 158(a)(3), Title 29, U.S. Code. The United States Supreme Court, however, has interpreted that language to mean that an individual may only be required to tender dues as a condition of employment; no one is required to become a full union member subject to union rules. *NLRB* v. *General Motors Corp.* (1963), 373 U.S. 734.

The parties agree that union discipline, such as the fines imposed by the Union in this case, may only be enforced against voluntary union members, as opposed to individuals who merely tender dues. In *NLRB* v. *Allis Chalmers Mfg. Co.* (1967), 388 U.S. 175, the United States Supreme Court upheld a union's right to impose disciplinary fines upon its members and to sue upon those debts. That holding was later refined to require that such lawsuits be maintained only against "voluntary" union members. *Scofield* v. *NLRB* (1969), 394 U.S. 423.

State law governs union lawsuits to collect disciplinary fines. *NLRB* v. *Boeing Co.* (1973), 412 U.S. 67. Under Ohio law, unions and other unincorporated associations may sue their voluntary members to collect debts and to enforce discipline. In *State, ex rel. Ohio High School Athletic Assn.*, v. *Judges* (1962), 173 Ohio St. 239 [19 O.O.2d 52], this court in effect upheld the discipline meted out by a voluntary association's tribunal, on the ground that the offending member, uncoerced, had signed membership contracts with full knowledge of the association's rules.

In this case, no one disputes that the Union's constitution forbade union members from crossing a lawful picket line, that the Union had a right to impose and collect disciplinary fines levied against union members who crossed such picket lines, and that the defendant union members indeed crossed such a picket line. Defendants argue, however, that they were not "voluntary" union members, and could not be subjected to union discipline.

At trial, the Union introduced evidence showing that defendants had signed a union membership application card by which each agreed to be bound by the organization's rules. The defendants do not deny they had applied for union membership; rather, they argue that each defendant was coerced into union membership by the Union's fraudulent misrepresentation to each defendant that union membership was a condition of continued employment. The alleged "misrepresentations," in essence, were that the Union failed to explain to each defendant the import of the United States Supreme Court's restriction on that statutory language as set forth in *NLRB* v. *General Motors Corp.*, *supra*. At the close of the evidence, the trial court permitted the issue of voluntariness to go to the jury; the trial court later denied the Union's and its officers' motion for judgment notwithstanding the verdict, or in the alternative, for a new trial.

Under Ohio law, where a party has reason to know the truth, that party cannot successfully maintain that he has been harmed by an alleged misrepresentation on the matter. In this case, testimony was offered to the effect that the employer provided a copy of the applicable collective bargaining agreement to each new employee when their probationary period was up. The applicable collective bargaining agreement included a union security clause, by which employees were required either to become members of the Union and to tender dues, or merely to pay to the Union the initiation fee and periodic dues uniformly required as a condition of acquiring or retaining membership in the Union. Regardless of any

statements made by union representatives, that collective bargaining agreement affirmatively stated that "[e]mployees as stated in this paragraph, may upon paying the initiation fee and dues, become members of the Union, however, *membership as such is not a condition of employment*." (Emphasis added.) Various defendants admitted having copies of the contract and having looked through it. Thus, if the defendants indeed relied on the Union's so-called misrepresentations, such reliance was unreasonable. Apparently none of the defendants inquired of any source independent of the Union itself as to whether union membership was indeed required for continued employment. Where, as here, an employee has reason to know of his legal option to merely tender dues rather than to join a union and the employee proceeds to join the union, the member is thereby bound by union rules and regulations.

On the other hand, various defendants offered evidence to the effect that they never received copies of documents which described the Union's rules, laws or regulations at any meaningful time, *i.e.*, prior to signing membership cards. Walter Allen testified that even after he had worked for the company for a few years, he was not permitted access to such documents, despite his specific request for copies of those governing documents. An employee must be permitted to make an informed choice as to whether to join, or not to join, a union.

Of course, the credibility of witnesses and weight of evidence are both within the province of the jury. However, in light of our disposition of the first issue and of the trial judge's own acknowledgment that the jury instructions and various claims may have been confusing to the jurors, we are compelled to remand the disposition of the Union's original claim for fines for a new trial. The trial judge charged the jury to "[c]onsider all evidence * * *"; we must assume that the jurors honored that charge. Unfortunately, because voluminous evidence as to the use of the federally protected epithet "scab" so permeated the trial, the jury's verdict against the Union on its original complaint for fines was very likely tainted as the result of passion or prejudice which would reasonably flow from such testimony.

Accordingly, the judgment of the court of appeals is reversed. We hereby enter final judgment notwithstanding the verdict in favor of appellants on all counterclaims for damages, and remand the cause for a new trial consistent with this opinon as to the Union's complaint for fines.

*Judgment reversed*
*and cause remanded in part.*

CELEBREZZE, C.J., SWEENEY, PATTON and DOUGLAS, JJ., concur.

WRIGHT, J., dissents in part and concurs in part.

HOLMES, J., dissents.

PATTON, J., of the Eighth Appellate District, sitting for LOCHER, J.

DOUGLAS, J., concurring. I concur with the majority in reversing the judgment of the court of appeals. In light of the absence of any evidence connecting the Union or its officers (appellants) to the property damage suffered by the appellees, indeed "the threshold issue is whether use of the epithet 'scab' may underpin a state tort action" for invasion of privacy and intentional infliction of emotional distress. I answer this question in the negative for two separate reasons.

First, pursuant to federal law, unions (and persons acting on their behalf) do have the right to use "intemperate, abusive, or insulting language without fear of restraint or penalty," *in the context of a labor dispute. Old Dominion Branch No. 496* v. *Austin* (1974), 418 U.S. 264, 283. Appellees urge several legal theories but each seeks to remedy the single alleged wrong of communication by appellants to third parties of appellants' low opinion of appellees — or, in a single word, defamation.

Since the very nature of defamation involves speech (either oral or written), it becomes necessary to determine the surrounding circumstances and context in which the alleged defamatory speech took place. That is particularly important in this case because the nature of the activity raises the question as to whether the complained-of speech took place as part of a labor dispute. If the activity was concerned with a labor dispute, then we are required to apply that body of law which regulates and protects concerted activity by an employer who has a disagreement with his employees, or workers who have a disagreement with their employer or with each other.

Whether or not a case arises in the context of a labor dispute is a question of law which the court, not a jury, must decide. *Hasbrouck* v. *Sheet Metal Workers Local 232* (C.A. 9, 1978), 586 F. 2d 691, 694. To make this determination, we must look to the National Labor Relations Act for the definition of "labor dispute" found at Section 152(9), Title 29, U.S. Code:

"The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether the disputants stand in the proximate relation of employer and employee.*" (Emphasis added.)

Where the union acts for some arguably job-related reason and not out of pure social or political concerns, a labor dispute exists. *Hasbrouck, supra,* at 694, fn. 3. In the case before us, the activities appellants were engaged in were precisely the types of concerted activities protected by the National Labor Relations Act. Thus, appellants' speech clearly took place "in a context where the policies of the federal labor laws leading to protection for freedom of speech are significantly implicated." *Old Dominion, supra,* at 279.

The foregoing determination is important because once the appellants'

speech is found to be related to a labor dispute, the Supreme Court of the United States has held that appellees may recover only if they are able to prove *actual* malice on the part of appellants. The landmark case in this regard is *Linn* v. *United Plant Guard Workers* (1966), 383 U.S. 53. In *Linn,* the Supreme Court adopted, for defamation actions arising out of labor disputes, the standard the court had announced in *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, for defamation actions involving public officials. To make such speech actionable, appellees here must prove that the statements made were, in fact, false, and either that appellants knew they were false or acted with reckless disregard of whether they were true or false. *Linn, supra,* at 65. There has been no showing of malice by appellees herein.

While on their face the statements made by appellants might appear to fall within the proscription of *Linn,* the courts have also set forth the "innocent construction" rule. If allegedly libelous words are susceptible to two meanings, one libelous and one innocent, "the libelous meaning should be rejected, and the innocent meaning adopted." *England* v. *Automatic Canteen Co. of America* (C.A. 6, 1965), 349 F. 2d 989, 991. In the case at bar, the words complained-of by appellees could be innocently construed as statements of opinion, not statements of fact. This is especially true in the atmosphere, context and location where the activity took place.

Thus, since the activity arose out of a labor dispute and appellees have failed to show actual malice, the epithets directed at appellees constituted nothing more than vituperous name-calling which does not give rise to a cause of action for defamation.

The question as to whether a certain statement alleged to be defamatory constitutes a statement of opinion or fact is clearly a question of law to be decided by the court. *Bigelow* v. *Brumley* (1941), 138 Ohio St. 574 [21 O.O. 471]. In determining whether a statement constitutes a statement of fact or opinion, both the context in which the statement is made and the manner in which it would be construed by those hearing or reading it must be considered. *Information Control Corp.* v. *Genesis One Computer Corp.* (C.A. 9, 1980), 611 F. 2d 781. Unless the name-calling can reasonably be interpreted as charging appellees with the commission of the conduct which may be associated with the chosen epithet, it is not libelous. *Greenbelt Cooperative Publishing Assn.* v. *Bresler* (1970), 398 U.S. 6. Appellees have failed to show that the speech of appellants, complained-of by appellees, is actionable under the foregoing principles.

Secondly, this case also involves important questions concerning First Amendment rights of free speech. The First Amendment guarantee of freedom of speech provides appellants with the "freedom to think as * * * [they] will and to speak as * * * [they] think," *Whitney* v. *California* (1927), 274 U.S. 357, 375 (Brandeis, J., joined by Holmes, J., concurring), overruled on other grounds, *Brandenburg* v. *Ohio* (1969), 395 U.S. 444 [48

O.O.2d 320], providing the speech creates no clear and present danger[1] nor constitutes "fighting words."[2] Obviously, the case at bar does not fit into either of these classifications as narrowly defined by the United States Supreme Court in the footnoted cases, *supra*.

This guarantee of freedom is one of our most cherished rights and, as such, has been and continues to be under attack by persons, well-meaning and otherwise, who see attempted curtailment as being in the "public good." Our government, as we generally know it today, was founded in 1789 with the adoption of the Constitution. The Bill of Rights, including the First Amendment, followed in 1791. When the Constitution was adopted, a number of people strongly opposed it on the basis that the document contained no Bill of Rights to safeguard certain basic freedoms. See 1 Annals of Congress (1834) 448 *et seq*. One of the greatest fears was that new powers granted to a central government might be used to curtail freedom of religion, press, assembly and speech. In answer to these concerns, James Madison suggested a series of amendments which, if adopted, would assure that these great liberties would remain safe and beyond the power of *any* branch of the government to abridge. One of his proposals became the First Amendment, and it is well to remember this history when we are tempted, in any way, to move to restrict any of these precious and valued rights. It is important to often repeat that the freedoms of speech, press, petition and assembly guaranteed by the First Amendment must be accorded to the ideas we hate or sooner or later they will be denied to the ideas we cherish.

The age-old ditty of "sticks and stones may break my bones but names will never hurt me" more appropriately applies to this case. The verbiage of the appellants, however offensive and annoying, amounts to a *damnum absque injuria*. Offensive utterances are a necessary side effect of free speech, whether in a labor context or not. Nonetheless, our premise must remain, that the suppression of speech is never justified merely because its content or mode of expression is offensive to those who hear it and object to the speech.

Accordingly, I concur.

WRIGHT, J., dissenting in part and concurring in part.

---

[1] See *Brandenburg* v. *Ohio* (1969), 395 U.S. 444, at 447 [48 O.O.2d 320], where the United States Supreme Court explained that words which create a clear and present danger are those which are "directed to inciting or producing imminent lawless action" and are "likely to incite or produce such action."

[2] See *Cohen* v. *California* (1971), 403 U.S. 15, at 20, where the court, relying upon *Chaplinsky* v. *New Hampshire* (1942), 315 U.S. 568, described "fighting words" as "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction."

## I

The majority's rejection of the jury verdict regarding the fines levied by the Union is fascinating exercise. The reasoning and result are reminiscent of *Marshall* v. *Gibson* (1985), 19 Ohio St. 3d 10. The leitmotif of both *Marshall* and the instant case appears to be: Where there's a will, there's a way. The "way" traversed by the majority is a path untrod by a court of last resort. I say this because a careful review of the reported case law throughout the United States reveals not a single case where any court, anywhere, has invoked the doctrine of passion and prejudice to set aside a defense verdict in the type of context we have at bar. I suspect counsel for *both* sides will be shocked to discover that, like Athena springing from the head of Zeus, this doctrine miraculously appears upon the scene. At no time during the course of the trial was there an objection to the massive amount of testimony the majority has now found so prejudicial. At no time was this argument even suggested to the trial court. At no time was it briefed or argued in the court of appeals. At no time was it briefed or argued before this court. It almost goes without saying that the majority has usurped the function of the trial court, the jury and the litigants and deprived appellees of due process of law in its rush toward this incredible result. This record contains page after page of conflicting testimony that the union membership applications signed by appellees were obtained through misrepresentation and/or coercion and duress. A unanimous court of appeals held that the issue of whether appellees were voluntary members or whether they had been coerced into joining the Union was clearly a jury issue and that the record disclosed evidence that, if believed, would support the jury's verdict.

Local 1297's lawsuit to collect these fines raises mixed questions of federal labor law and Ohio voluntary association and contract law. In *NLRB* v. *Allis-Chalmers Mfg. Co.* (1967), 388 U.S. 175, the United States Supreme Court upheld a union's right to impose disciplinary fines upon its voluntary members and to sue upon that debt. That holding was refined in *Scofield* v. *NLRB* (1969), 394 U.S. 423, which approved of union lawsuits to collect disciplinary fines *only* when the members are "free to leave the union and escape the [union] rules" and where their membership in the union is *voluntary. Id.* at 430.

In Ohio, unions and other unincorporated associations can sue their voluntary members to collect debts or enforce discipline. See, *e.g., State, ex rel. Ohio High School Athletic Assn.,* v. *Judges* (1962), 173 Ohio St. 239 [19 O.O.2d 52] ("*OHSAA*"); *Hennekes* v. *Maupin* (1963), 119 Ohio App. 9 [26 O.O.2d 97]; *Lough* v. *Varsity Bowl, Inc.* (1968), 16 Ohio St. 2d 153 [45 O.O.2d 483]. These Ohio cases, however, recognize that only *voluntary* members, with *full* knowledge of the association's rules, can be bound by the association's discipline. In *OHSAA* this court in essence upheld the discipline meted out by a voluntary association's tribunal because the offending member had willfully signed its membership contracts *"with full*

*knowledge of and subject to the rules* of the association * * *." (Emphasis added.) *Id.* at 250. See, also, *Scofield* v. *NLRB, supra,* at 430.

This court's ruling in *OHSAA* should be contrasted with the disputed facts of the instant case. Here, there was a substantial amount of testimony to support the following points:

1.  None of the appellees ever sought membership in the Union.

2.  All appellees were told by the Union that they would be fired if they did not formally join the Union and sign a membership card.[3]

3.  The Union's officers admitted that they enforced a "requirement" of formal membership.

4.  None of the appellees ever received copies of the Union's rules, governing laws or constitution, despite the fact that two of them made specific requests for these governing documents.

5.  Contrary to the majority's assertion that appellees had copies of the collective bargaining agreement, *nothing* in the record shows that appellees actually received a copy of the collective bargaining agreement *prior to* the time that they were required by union officials, upon pain of discharge, to "join" the Union. What the record does indicate is that at some unspecified time, perhaps years later, *some* of the appellees *may* have obtained copies of the collective bargaining agreement.

The court of appeals was absolutely right in holding that the jury was clearly entitled, under both Ohio and federal law, to hear appellees' evidence on the alleged fraudulent and involuntary nature of their union "membership" and to render a verdict based upon that evidence.

The trial court properly and carefully charged the jury on the issues and received an accolade with respect to same from counsel for appellants. While I can understand the majority's dissatisfaction with the result, I cannot accept its method of expressing its disapproval, and must dissent.

II

I quite agree with Justice Brown's and Justice Douglas' analysis of the free speech issue. Tort actions based upon theories of libel, slander or intentional infliction of emotional distress cannot survive when premised upon constitutionally protected speech. However, it must be noted that appellants made no request for any sort of jury instruction on this very complex issue.

Appellants complain that the trial court erred in failing to sustain their motion for post-verdict relief. I must agree with the court of appeals when it stated that:

"Notwithstanding the parties have regaled us with an extensive recitation of the evidentiary support (or lack thereof) for this claim, we

---

[3] The Union's statements were apparently made despite the fact that formal membership in a union cannot be required as a condition of employment. *NLRB* v. *General Motors Corp.* (1963), 373 U.S. 734.

overrule the assignment of error for several reasons, most of which relate to what was *not* done by Local 1297 to either protect the record, demonstrate the error, or give the trial court the opportunity to correct its own error. [Emphasis *sic.*]

"* * *

"Local 1297 filed no motion for directed verdict on either of the claims of this counterclaim; nor did it move to withdraw one of the issues from the consideration of the jury. See *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369.

"No error is assigned to the trial court's pre-trial overruling of Local 1297's motion for summary judgment.

"Numerous verdict forms of this counterclaim cause of action were painstakingly prepared by the trial court and submitted to the jury without objection by the Local 1297.

"Prior to charging the jury, counsel were given the opportunity for specific input.

"* * *

"[After the jury was charged], counsel were given an opportunity to make specific objections to the charge * * *.

"Finally, Local 1297 did not avail itself of the opportunity to test and challenge the verdicts of the jury by special interrogatories. Civ. R. 49(B)."

Finally, and perhaps most importantly, appellants concede that at no time did they ever argue the free speech issue in either the trial court or before the court of appeals. If one thing is crystal clear in the law, it is that "* * * questions not raised or passed upon by the lower courts will not be ruled upon by the Supreme Court. * * *" *Mills-Jennings, Inc.* v. *Dept. of Liquor Control* (1982), 70 Ohio St. 2d 95, 99 [24 O.O.3d 181]; see, also, *Zakany* v. *Zakany* (1984), 9 Ohio St. 3d 192, 193; *Moats* v. *Metropolitan Bank of Lima* (1974), 40 Ohio St. 2d 47, 49-50 [69 O.O.2d 323].

The majority opinion "cures" the problem by invoking the doctrine of plain error. This is judicial legerdemain at its worst. Perhaps this novel manner of reaching a preordained result would be a bit more palatable if the majority had deigned to grant appellees the opportunity for a jury trial. Thus I must dissent.

HOLMES, J., dissenting. Because I believe the law fully supports appellees' affirmative defense and counterclaims, I must dissent.

I

The majority asserts that the trial court erred as a matter of law in submitting to the jury the issue of whether the appellant union made material representations to induce appellees to join the organization, *i.e.*, that appellees must join or lose their jobs. It is contended that the representations at issue were mere "correct statements of federal

statutory law," which only omitted United States Supreme Court interpretations. The majority also asserts that appellees had "reason to know" of their true rights because of the availability of the collective bargaining agreement. Finally, it is asserted that any reliance on the part of these complaining workers "was unreasonable."

The law is quite clear that appellant may impose fines on its members under particular circumstances. See, *e.g.*, *NLRB* v. *Allis-Chalmers Mfg. Co.* (1967), 388 U.S. 175. Also, the power of courts to inquire into the amounts of fines imposed by appellant is severely limited as "delving into internal union affairs." See *NLRB* v. *Boeing Co.* (1973), 412 U.S. 67, 74. However, when, as here, the individual workers were coerced into joining appellant's organization, appellant may not then maintain a lawsuit to collect debts resulting from fines imposed on such workers. *Scofield* v. *NLRB* (1969), 394 U.S. 423. One form of coercion, clearly applicable here, is fraudulent misrepresentation of a material fact which is intended to, and does, result in reliance on that misrepresentation. Fraud in the inducement vitiates the transaction. These principles of state contract law clearly control in the circumstances *sub judice. Scofield, supra,* at 426, fn. 3. Therefore, if these workers were fraudulently coerced into joining, then their membership was void *ab initio* and appellant would not be entitled to the fines at issue. It therefore remains to inquire whether the workers so carried their burden of production as to have a jury consider their defense.

At trial, the workers demonstrated by reliable, believable testimony that both company and appellant's officials told them that they would be required to join as a condition of employment. The testimony of the appellant's highest officers, including the president, former president, and former recording secretary, was that they enforced the appellant's requirement of formal membership as a condition of employment. If true, this violated United States labor law as announced in *NLRB* v. *General Motors Corp.* (1963), 373 U.S. 734.

There was testimony that officials actively approached appellees and told them that they could not remain employed at the company if they did not sign membership cards and formally join the Union. Further, appellees testified that they had never received any copy of the appellant's rules, laws or constitution; that requests for such were made and not answered; and that there was no regular dissemination of such rules, laws or constitution. Finally, there was no evidence presented by the appellant that these workers ever actually received a copy of the collective bargaining agreement prior to placing their signatures on the membership application cards.

The workers have therefore demonstrated more than enough direct, factual evidence to negate the assertion that there was no misrepresentation by appellant. Since the availability of all documents containing the notice of right to abstain from membership, including the collective bargaining agreement, was a thoroughly controverted factual issue, there

can be no rational assertion that the trial court improperly submitted the issues of reasonableness of reliance and availability of material knowledge to the jury. Furthermore, "correct statements of federal statutory law" which omit relevant United States Supreme Court holdings on material points are inadequate, as a matter of law. The majority implies that the holdings of the United States Supreme Court are not of equal force with the federal statutes. Such nonsense would ordinarily be ignored were it not used by the majority to trammel the freedoms of these workers granted under relevant federal law and the collective bargaining contract. The jury was therefore fully entitled to believe, as it did, that appellees were fraudulently induced to join appellants' organization.

## II

The more important issue before this court is whether the counterclaims asserted by the workers, *i.e.,* that appellants committed upon them the intentional torts of invasion of privacy and intentional infliction of emotional distress, are in fact precluded by the First Amendment. The majority concludes that "the overwhelming majority of evidence presented to the jury consisted of federally protected speech," and on that basis, the jury determination to the contrary was overturned. The majority's conclusory treatment of both the facts and the law renders quite conspicuous the absence of legal analysis from its opinion. Appellees' counterclaims were not brought because of delicate sensitivities to speech in the form of mere "name calling." Instead, this court was squarely presented with actions, the design, intent and result of which were to make these workers' lives utterly miserable for an extended period of time.

In the case of *Linn* v. *United Plant Guard Workers* (1966), 383 U.S. 53, the court noted that intentional tort remedies were applicable where statements were uttered with " 'a deliberate intention to falsify' or 'a malevolent desire to injure.' * * * In such case[s], the one issuing such material forfeits his protection under the Act. * * *" *Id.* at 61.

In *Farmer* v. *United Brotherhood of Carpenters & Joiners* (1977), 430 U.S. 290, there existed "a campaign of personal abuse and harassment" to one who disagreed with a particular organizational policy. The issue in that case was whether "outrageous conduct, threats, and intimidation," much of which was accomplished by the use of mere words, could be the basis for a tort action in the state court. *Id.* at 293. The court stated at 299-300 that: "Nothing in the federal labor statutes protects or immunizes from state action violence or the threat of violence in a labor dispute * * *. Such actions can be adjudicated without regard to the merits of the underlying labor controversy. *Automobile Workers* v. *Russell* [(1958), 356 U.S. 634] * * *." It was later added at 302 that "there is no federal protection for conduct * * * which is so outrageous that 'no reasonable man in a civilized society should be expected to endure it.' * * *" The emergent rule

from these cases is that claims for intentional injury brought in state court are neither pre-empted by federal law nor barred by the First Amendment. Both *Linn* and *Farmer* continue to be relied upon for this very proposition. See *Sears, Roebuck & Co.* v. *Carpenters* (1978), 436 U.S. 180, 204; *Local 926, Internatl. Union of Operating Engineers* v. *Jones* (1983), 460 U.S. 669, 681, at fn. 11; *Bill Johnson's Restaurants, Inc.* v. *NLRB* (1983), 461 U.S. 731, 742; *Belknap, Inc.* v. *Hale* (1983), 463 U.S. 491, 498; *Allis-Chalmers Corp.* v. *Lueck* (1985), ____ U.S. ____, 85 L. Ed. 2d 206.

Furthermore, Ohio has adopted the same rule in *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369. The rule is grounded on "the nature of the State's interest in protecting the health and well-being of its citizens." *Farmer, supra,* at 303. The majority has deliberately undermined this interest by today's decision. Nevertheless, the law could not be clearer that appellees may sue in tort where they are the objects of threats of violence, bodily and emotional harm, and damage to their property.

The majority has intentionally miscast the appellees' counterclaims, as well as the evidence offered at trial, to constitute nothing more than a veiled attack on freedom of speech. It consequently rushes to apply the overly broad dicta contained in *Old Dominion Branch No. 496* v. *Austin* (1974), 418 U.S. 264. That case is twisted to represent the absurd notion that "state tort actions simply cannot be founded upon use of language * * * such as the epithet 'scab.' * * *" However, *Old Dominion* in fact stands for the quite narrow proposition that: "The *Linn* Court explicitly adopted the standards of *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964), * * *," as the standards applicable to defamatory publications, *i.e.,* falsehoods which injure one's reputation. *Old Dominion, supra,* at 281.

Nothing could be plainer than the legal theories which frame appellees' counterclaims. There is no mention of libel or slander. They claim that appellants committed the tort of either intentional infliction of emotional distress or invasion of privacy. What is therefore absolutely irrelevant is the meaning of the term "scab," or its permissive use within a labor context under the First Amendment. See *Linn, supra,* at 60-61. What instead becomes the focus of analysis is the *conduct* of appellants toward appellees. Consequently, it must be inquired whether the evidence presented below exceeded the bounds "of verbal abuse [which] constituted the mere use of the epithet 'scab' " or was instead evidence of acts so outrageous that no reasonable man in a civilized society should be expected to endure them.

Evidence at trial demonstrated an organized punishment of dissenting workers which was utterly vicious in its manifestations. There was direct evidence that some of the appellant's officers cursed, screamed and acted in a threatening manner toward two of the appellees, a husband and wife, at a public restaurant. The couple's departure was purposely blocked by these appellants and, in an apparent attempt at provocation, they loudly referred to the wife as a "bitch." Several of appellant's officers continual-

ly ran their automobiles onto the sidewalk at one of the appellees, in mock attempts to run him down. A union officer threatened to strike one of the appellees with a large metal gear.

As often as three times a day, appellants led groups to shout at appellees while appellees were attempting to operate their machinery and perform on-the-job functions. These activities were conducted on company property and during working hours. There was testimony that appellant's officer claimed responsibility for having one appellee fired by intentionally damaging the machine he operated while he was on a coffee break. There was also testimony offered that threats of physical violence were regularly made to appellees.

While no one individual was actually apprehended performing the numerous tire-slashings, window-smashings, and other incidents of property damage, there was ample circumstantial evidence offered to infer that appellants, in fact, were directly responsible. On one of the occasions when nails were strewn all over an appellee's driveway, there was also prominently displayed a sign with the word "scab" thereon. This use of the word "scab" was evidence that the workers were being punished for activities disapproved by appellants. There was testimony that appellants knew of and approved of the tire slashings, window breakings and other property damage. A worker's parents received a threatening letter promising accidents unless he complied with appellants' mandate. One of the appellant's officers threatened that "[f]ar worse things are going to happen to you." It seems apparent that there was fully sufficient evidence to support the trial court's decision to send the tort issue to the jury as well as to support the jury's finding that appellants were liable for the injuries caused.

The majority appears to be blinded by the context of the activities in question. Certainly, the average factory worker would be dumbfounded to discover that he, like appellees herein, "must be required to endure" the acts of terrorism described above, which the majority characterizes as "the use of language which enjoys federal protection." Far from an exercise of First Amendment rights, what occurred was in fact a purging of dissenters in violation of *their* First Amendment and other constitutional rights.

Accordingly, I would affirm the judgment of the court of appeals.