CALLEN et al., Appellants,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
LOCAL 100, Appellee; Stockman et al.▮

[Cite as *Callen v. Internatl. Bhd. of Teamsters, Local 100* (2001), 144 Ohio App.3d 575.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000715.

Decided June 29, 2001.

576

*Eric C. Deters & Assoc., PSC,* and *Eric C. Deters,* for appellants.
*Logothetis, Pence & Doll* and *Julie C. Ford,* for appellee.

PAINTER, Judge.

Today, we join our colleagues in the Sixth, Seventh, and Tenth Appellate Districts and adopt the federal Norris–LaGuardia standard for union liability in strike-related intentional torts. Though previous Ohio cases have treated the

Norris–LaGuardia standard as evidentiary, we hold that it also modifies common-law agency principles.

The standard requires that, in order for a union to be liable for the intentional torts of its members, there must be clear and convincing proof of actual participation in, authorization, or ratification after actual knowledge, of the intentional act that caused the claimed damage or injury.

## I. The Lawsuit

Appellants Steve and Suzette Callen brought an intentional-tort action against appellee International Brotherhood of Teamsters, Local 100 ("the union"), and defendants John Stockman and Jimmy Matheson as a result of an incident that had occurred while Stockman and Matheson were picketing. The Callens alleged that Mr. Callen had suffered injuries and that Mrs. Callen's car had been damaged when Stockman kicked it. They further alleged that the union was vicariously liable based on the doctrine of respondeat superior and general agency principles. They also claimed that the union had negligently placed agents predisposed to violence on the picket line and had negligently instructed and trained the picketers.

The trial court granted summary judgment in the union's favor. It concluded that the union was not liable for Stockman's and Matheson's misconduct under the doctrine of respondeat superior, because "an act of violence such as an intentional assault conceived in anger is generally a departure from the scope of the agency bestowed upon the agent by the principal." It also determined that the only negligence for which the union could be held liable was the placement of Stockman and Matheson on the picket line with actual or constructive knowledge of their propensity toward violence, when that violence could somehow benefit the union. The court concluded that the Callens had failed to produce any evidence that the union had such knowledge. The Callens thereafter dismissed with prejudice their claims against Stockman and Matheson.

On appeal, the Callens raise one assignment of error, asserting that the trial court erred in granting summary judgment in favor of the union. While we agree that the entry of summary judgment was proper, we do so for reasons somewhat different than those given by the trial court.[1]

## II. Summary Judgment Standard

To appropriately grant summary judgment, a trial court must conclude, after construing the evidence most strongly in favor of the nonmoving party, that there

---

1. See *Hall v. Gill* (1995), 108 Ohio App.3d 196, 205, 670 N.E.2d 503, 509.

is no genuine issue of material fact; that the movant is entitled to judgment as a matter of law; and that reasonable minds can come to but one conclusion, and that conclusion is adverse to the nonmoving party.[2] Because the trial court "must bear in mind the actual quantum and quality of the proof necessary to support" the claim, it "must view the evidence presented through the prism of the substantive evidentiary burden."[3] On appeal, we review *de novo* the entry of summary judgment.[4]

### III. The Altercation

The employees of Hilltop Basic Resources, Inc., a cement company, voted to strike in protest against alleged unfair labor practices by the company. The strike was authorized, and the union knew that there would be picketing at different sites. On the morning of the incident, Matheson decided to set up a picket line at Children's Hospital after following the company's trucks and determining that they were going to pour concrete at the hospital. Consequently, Stockman and Matheson were picketing outside a construction entrance to Children's Hospital on behalf of the union, the employees' collective-bargaining representative.

Stockman was neither a union employee nor an officer, but he did receive some strike benefits. Matheson was an organizer employed by the union, but not an officer. The union president, Alan K. Barnes, described an organizer as an employee "who follows leads from nonunion employees seeking representation." Ron Agnor, acting union president at the time of the incident, described Matheson's role as organizing and supporting picketers on the strike line.

Matheson testified that, during the picketing at Children's Hospital, he was acting merely as a volunteer picketer. Picketing requires two people, and, besides Stockman, there was no one else to picket that morning. At some time before the picketing, Matheson did conduct a meeting in which he instructed Stockman and others on how to properly engage in peaceful picketing. Included in the instructions was an admonition to ignore abusive people and to avoid all confrontations. According to Agnor's deposition testimony, Agnor sent a letter to drivers forbidding, among other strike activities, the initiation of contact with the general public.

---

**2.** See *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47.

**3.** See *Anderson v. Liberty Lobby* (1986), 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215.

**4.** See *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212.

While Stockman and Matheson were picketing, Mr. Callen arrived at the hospital to visit his daughter. Mr. Callen and Stockman engaged in a fight after Callen complained to Stockman about a dent in his car that occurred when Stockman kicked it. According to Mr. Callen, when he drove through the gate where Stockman and Matheson were picketing, Stockman yelled that he did not care about Mr. Callen's daughter and kicked the car. At Stockman's request, Mr. Callen left the parking lot to discuss the dent, and Stockman approached him with closed fists. The fight ensued. According to Mr. Callen, Matheson then waited until Callen's back was to him and threw a piece of brick or stone, striking him.

In his deposition, Stockman denied damaging the car and testified that he felt threatened because Mr. Callen had told him that he was going to "kick his ass." Stockman approached Callen and motioned for him to "come on." Matheson testified that Callen had acted "crazy" and had threatened to kill Stockman and to "kick Matheson's ass." Matheson threw a piece of "washout" or soggy cement at Callen, because he was scared and wanted to break up the fight.

Officers of the union testified that the union did not condone or encourage violence or abusive behavior on the picket line. After learning of the incident, the union suspended Matheson without pay and ordered Stockman not to return to the picket line.

## IV. Liability under Respondeat Superior

The trial court applied the doctrine of *respondeat superior* to conclude that the union was not liable for the unlawful conduct of Stockman and Matheson. It found that the assault had occurred outside the scope of the picketing authorized by the union. *Respondeat superior* holds a master liable for the acts of its servant performed in the scope of the servant's employment, regardless of authorization or ratification.[5] While an intentional tort is generally outside the scope of employment, a master is held liable under *respondeat superior* if the conduct giving rise to the tort is " 'calculated to facilitate or promote the business for which the servant is employed.' "[6] Under the doctrine, however, a master is not liable for "independent self-serving acts [of his servants that] in no way facilitate or promote his business."[7] Whether conduct is within the scope of

---

5. See Restatement of the Law 2d, Agency (1958) 468, Section 216.

6. See *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 58, 565 N.E.2d 584, 587, quoting *Little Miami RR. Co. v. Wetmore* (1869), 19 Ohio St. 110, 132.

7. See *Byrd v. Faber* at 59, 565 N.E.2d at 588.

employment is ordinarily a question of fact unless reasonable minds can come to but one conclusion.[8] Then it becomes an issue of law.

## V. The Norris–LaGuardia Standard

■ The standard that we adopt today is a variation of vicarious liability based on agency principles. Under this more stringent standard, there must be clear and convincing evidence that the union actually participated in or authorized the misconduct of its members or officers, or ratified the misconduct of its members or officers after actual knowledge of the wrongdoing. Thus, not only is the burden of proof heightened, but there must also be actual participation, actual authorization, or actual ratification.[9]

In 1932, the United States Congress enacted Section 6 of the Norris–LaGuardia Act[10]:

"No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."

■ The purpose of the Act "was to relieve organizations, whether of labor or capital, and members of those organizations from liability for damages or imputation of guilt for lawless acts done in labor disputes by some individual officers or members of the organization without clear proof that the organization or member, charged with responsibility for the offense, actually participated, gave prior authorization, or ratified such acts after actual knowledge of their perpetration."[11]

■ Section 6 "require[es] 'clear proof' that [the] person or organization charged actually participated in, authorized, or ratified 'such acts.'"[12] The United States Supreme Court has not determined whether Section 6 "should be

**8.** See *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 330, 587 N.E.2d 825, 829.

**9.** See *Carbon Fuel Co. v. United Mine Workers of Am.* (1979), 444 U.S. 212, 216, 100 S.Ct. 410, 414, 62 L.Ed.2d 394, 398–399, fn. 6.

**10.** See Section 106, Title 29, U.S.Code.

**11.** See *United Bhd. of Carpenters & Joiners of Am. v. United States* (1947), 330 U.S. 395, 403, 67 S.Ct. 775, 780, 91 L.Ed. 973, 982–983.

**12.** See *Ramsey v. United Mine Workers of Am.* (1971), 401 U.S. 302, 309, 91 S.Ct. 658, 663, 28 L.Ed.2d 64, 70.

called a [new] rule of evidence or one that changes the substantive law of agency." [13] But in *United Mine Workers of America v. Gibbs*,[14] the court did comment that the Norris–LaGuardia Act created a more stringent standard than that imposed under the ordinary doctrines of agency.

■ Under the Norris–LaGuardia standard, union responsibility for the misconduct of its servants may not be inferred under common-law agency principles. Common-law *respondeat superior* holds a master liable even though the master is not at fault and even though the master might not know or approve of the servant's acts. In contrast, Norris–LaGuardia requires more. As explained by the United States Supreme Court:

"We hold, therefore, that 'authorization' as used in [Section] 6 means something different from corporate criminal responsibility for the acts of officers and agents in the course or scope of employment. We are of the opinion that the requirement of 'authorization' restricts the responsibility or liability in labor disputes of employer or employee associations, organizations or their members for unlawful acts of the officers or members of those associations or organizations, although such officers or members are acting within the scope of their general authority as such officers or members, to those associations, organizations or their officers or members who actually participate in the unlawful acts, *except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from a granted authority,* by the association or nonparticipating member sought to be charged or was subsequently ratified by such association, organization or member after actual knowledge of its occurrence."[15]

While it is clear that the Norris–LaGuardia Act applies only to federal courts (though it has seemingly been presumed to apply in some state courts), its theory of union liability has been adopted by state courts and state legislatures. "Certain states have enacted what are known as 'little Norris–LaGuardia acts' which were modeled after the federal scheme. The remaining jurisdictions are controlled in this area either by statutes not resembling the Norris–LaGuardia Act or by the common law of the jurisdiction. * * * [O]ne common thread runs

---

**13.** See *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. at 403, 67 S.Ct. at 780, 91 L.Ed. at 982.

**14.** See *United Mine Workers of Am. v. Gibbs* (1966), 383 U.S. 715, 736, 86 S.Ct. 1130, 1144, 16 L.Ed.2d 218, 233–234.

**15.** See *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. at 406–407, 67 S.Ct. at 781, 91 L.Ed. at 984 (emphasis added and footnote omitted).

through all of these schemes: there must be some showing of union participation in, authorization of, or ratification of the violent acts for any liability to attach." [16]

## VI. Participation, Authorization, or Ratification

Federal courts have defined "authorization" under the Norris–LaGuardia standard as something more than action taken within the scope of general authority. Authorization occurs when the charged act is actually authorized or "necessarily follow[s] from the granted authority." [17] "Ratification" requires actual knowledge or approval of the act charged. [18] "Participation" would seem to depend upon the number and status of the individuals participating, as well as the extent of the union's knowledge of and power to control their actions. [19]

## VII. Ohio's Use of the Norris–LaGuardia Standard

Ohio has not enacted a "little Norris–LaGuardia Act." Courts that have considered whether the standard of the Norris–LaGuardia Act should be applied in the absence of state statutory authority have held that "a heightened burden of proof standard is a question of state public policy." [20] Ohio is among those states that have recognized such a public policy. In 1965, the Ohio Supreme Court determined that a union member could bring a suit against the union for the tort of libel by a union agent acting within the scope of his authority. [21] The court's focus was on whether a union is a legal entity apart from its members. In 1982, the Sixth Appellate District assumed that the Norris–LaGuardia standard applied to state courts when it stated, "To hold [a union] responsible [for intentional torts], it is elementary that appellant must show that this defendant participated in, authorized or ratified the acts complained of in the picketing * * *." [22] The

---

**16.** See Carlson, Reducing Strike Violence by Expanding Union Liability (1990), 19 Cap. U.L.Rev. 211, 212.

**17.** See *United Bhd. of Carpenters & Joiners of Am. v. United States*, 330 U.S. at 406, 67 S.Ct. at 781, 91 L.Ed. at 984.

**18.** See *id.* at 407, 67 S.Ct. at 781, 91 L.Ed. at 984.

**19.** See *United Aircraft Corp. v. Internatl. Assn. of Machinists* (1971), 161 Conn. 79, 89, 285 A.2d 330, 338.

**20.** See *Vikman v. Internatl. Bhd. of Electrical Workers, Local 1269* (Colo.1995), 889 P.2d 646, 661.

**21.** See *Miazga v. Internatl. Union of Operating Engineers, AFL–CIO* (1965), 2 Ohio St.2d 49, 31 O.O.2d 27, 205 N.E.2d 884, syllabus.

**22.** See *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* (Aug. 6, 1982), Lucas App. No. L–82–020, unreported, 1982 WL 6541, affirmed in part and reversed in part on other grounds in (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

court held that the injured party had to show that the union participated actively in planning or actually carrying out the unlawful acts.

In 1986, the Ohio Supreme Court determined that to hold a union liable for property damage and intentional emotional distress allegedly sustained by persons who had crossed a picket line, the injured parties had to provide "direct evidence which links the union to that damage, [and] which shows that the Union or its officers authorized, condoned, or ratified such incidents of actual property damage." [23]

In 1989, the Tenth Appellate District determined that, "[f]or the union to incur liability, it must be shown that the unlawful acts were committed by its agents and that the union actually participated in, authorized, or ratified the unlawful conduct engaged in by its agents and members." [24] According to the court, factors to be considered in deciding whether the union authorized, ratified, or condoned unlawful conduct by its agents, members, and officers were whether (1) the misconduct furthered the union's interests, (2) the union's officers or agents encouraged or incited the misconduct, (3) the officers took steps to prevent repeated misconduct or failed to discipline strikers who engaged in repeated misconduct, and (4) whether the misconduct continued after it had been enjoined.[25]

In 2000, the Seventh Appellate District stated that it was the aggrieved party's "obligation at trial to provide direct evidence that links [the union and its members and officers] to the claimed property damage and shows that [it] authorized, condoned, or ratified the claimed damages." [26] It held, based upon the language of Section 6 of the Norris–LaGuardia Act, that the clear-proof test must be applied when determining a union's liability in a labor dispute. In support of its holding, it relied on the fact that other state courts had applied the federal standard, including the Sixth Appellate District in *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*[27] (And it found

---

23. See *Local Lodge 1297, Internatl. Assn. of Machinists & Aerospace Workers v. Allen* (1986), 22 Ohio St.3d 228, 231, 22 OBR 407, 409, 490 N.E.2d 865, 868. See, also, *Dickerson v. Internatl. United Auto Workers Union* (1994), 98 Ohio App.3d 171, 648 N.E.2d 40; *Norton Hambleton, Inc. v. Internatl. Union, United Mine Workers of Am.* (July 22, 1987), Perry App. No. CA–365, unreported, 1987 WL 14471.

24. See *Quick Air Freight, Inc. v. Teamsters Local Union 413* (1989), 62 Ohio App.3d 446, 457, 575 N.E.2d 1204, 1212.

25. See *id.*

26. See *Calex Corp. v. United Steelworkers of Am.* (2000), 137 Ohio App.3d 74, 738 N.E.2d 51, discretionary appeal not allowed (2000), 89 Ohio St.3d 1465, 732 N.E.2d 998.

27. *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.* (Aug. 6, 1982), Lucas App. No. L–82–020, unreported.

particularly persuasive that the Ohio Supreme Court had affirmed *Yeager* in part without rejecting the appellate court's reliance on Section 6 of the Norris–LaGuardia Act.)

In deciding to adopt the federal standard, the Seventh Appellate District also found persuasive the following policy reasons: consistency between state and federal labor decisions, decreased forum shopping, and application of the same standard to prove union liability in a labor dispute and to prove a state claim for punitive damages. The court concluded that "[t]o hold otherwise would dangle the sword of liability over a union and its officers for the illegal acts of its individual members." [28] Relying on *United Mine Workers v. Gibbs*, the court further held that "the plaintiff has the burden to persuade the trier of fact by a substantial margin that the union, officer, or the individual member charged authorized, participated in or ratified the damaging conduct of its members." [29] In its view, normal union functions such as supporting a strike, helping a local union organize, assisting in negotiations, and providing money to be distributed by a local union would not constitute authorization, ratification, or participation in misconduct.[30]

Though we recognize that some states continue to use common-law agency principles to determine the vicarious liability of a union for the misconduct of its officers or members, we conclude that Ohio has chosen to impose union liability for the misconduct of members or officers only when there is clear and convincing proof that the union actually participated in, authorized, or ratified the misconduct.

■ We use the term "clear and convincing proof" because it is the terminology in Ohio. Clear proof in the Norris–LaGuardia Act is defined as proof that is clear, unequivocal, and convincing.[31] Thus, clear and convincing proof is the standard that we apply to the facts of this case. "Clear and convincing proof" is between the criminal standard of "beyond a reasonable doubt" and the preponderance-of-the-evidence standard normally applied in civil cases: its nature is such that it will produce in the factfinder's mind a firm belief as to the allegations sought to be established.

---

28. See *Calex Corp. v. United Steelworkers of Am.*, 137 Ohio App.3d at 82, 738 N.E.2d at 57.

29. See *id.*

30. See *id.* at 82–83, 738 N.E.2d at 57.

31. See *Ramsey v. United Mine Workers* at 311, 91 S.Ct. at 664, 28 L.Ed.2d at 71.

### VIII. No Clear and Convincing Evidence of Actual Participation, Authorization, or Ratification

 Construing the evidence most strongly in favor of the Callens, we must determine whether there is clear and convincing proof that the union actually participated in, authorized, or ratified both the assault on Mr. Callen and the damage to the car he was driving. The union officers testified that they did not condone violence on any picket line. Matheson testified that he had instructed picketers to avoid confrontation. Matheson also testified that he had been picketing as a volunteer and not as an organizer. The union suspended Matheson for his misconduct and took both Stockman and Matheson off the picket line.

The Callens argue that, because the picketing occurred with the union's blessing and consent, it authorized, ratified, or participated in the assault. But the evidence fails to raise a genuine issue of material fact concerning whether the union actually authorized, participated in, or ratified either the assault on Mr. Callen or the damage to Mrs. Callen's car.

### IX. Negligent Supervision or Training

Further, we are not persuaded, under the Norris–LaGuardia standard, that there is a cognizable claim for negligent supervision or training under the facts of this case. Instead, there must be clear and convincing proof that the union actually participated in, authorized, or ratified the misconduct at issue.

 But even if we were, for the sake of argument only, to construe negligent supervision and training as an act of actual participation in misconduct, the Callens would still lose. Under principles of negligent supervision, the servant's conduct must be foreseeable.[32] Misconduct is foreseeable only if the master knows or should know of the servant's "propensity to engage in similar criminal, tortious, or dangerous conduct." [33] Here there was no evidence, much less clear and convincing evidence, that the union knew of any propensity for violence in Stockman or Matheson. As for negligent training, the evidence demonstrated that picketers were instructed not to engage in confrontations with the general public, and that they attended a class on how to picket lawfully. Thus, the union could not be held liable for negligently supervising or training Stockman and Matheson. They were trained. At most, the Callens demonstrated that Stockman and Matheson chose to ignore their training.

---

**32.** See *Wagoner ex rel. Washburn v. United Dairy Farmers, Inc.* (Nov. 17, 2000), Hamilton App. No. C–990767, unreported, 2000 WL 1714252.

**33.** See *id.*

Thus, based on common-law agency principles, the trial court would have been correct, even without applying the more stringent standard.

For all of the foregoing reasons, we overrule the Callens' assignment of error and affirm the judgment of the trial court.

*Judgment affirmed.*

DOAN, P.J., and SUNDERMANN, J., concur.