STEPIEN, APPELLANT, v. FRANKLIN ET AL., APPELLEES.

(No. 52437 — Decided May 9, 1988.)

*Hermann, Cahn & Schneider, Kent B. Schneider, Kerry S. Volsky* and *Jay H. Salamon,* for appellant.

*Hahn, Loeser & Parks, David C. Weiner* and *Brenda T. Bodnar,* for appellees.

WERREN, J. This cause of action arises as a result of an action for slander and intentional infliction of emotional distress by the appellant, Theodore J. Stepien, against the appellee, Peter J. Franklin, et al.[1]

Theodore J. Stepien ("Stepien") is the former President of the Cleveland Professional Basketball Company, more commonly known as the Cleveland Cavaliers. The Cleveland Cavaliers is a professional basketball franchise operated under the auspices of the National Basketball Association ("NBA"). In addition to his position with the Cavaliers, appellant was also the President and sole shareholder of Nationwide Advertising Service, Inc., the largest personnel recruitment advertising company in the world with offices throughout the United States and Canada. Nationwide was also the principal shareholder of the Cavaliers. Appellant's tenure as President of the Cavaliers began in June 1980 and he remained in that position until the team was sold to George and Gordon Gund in May 1983.

Appellee Peter J. Franklin

---

[1] Other appellees in this case are Pacific & Southern Company, Inc., Radio WWWE, Combined Communications Corporations and Gannett Company, Inc.

("Franklin") is the host of a radio sports talk show known as "Sportsline." During the period in question, Sportsline was regularly broadcast Monday through Friday, 7:00 p.m. to midnight, unless it was pre-empted by a live sports event. Franklin principally employed an audience call-in format—listeners are encourged to call in and give their opinions and/or solicit Franklin's opinion about sports. Sportsline is entertainment, designed to encourage and capitalize on the considerable public interest in professional sports.

The style of radio and television personalities who host talk shows such as Sportsline varies widely, from the erudite analysis of William F. Buckley to the insults of Joan Rivers. Franklin's style, which is immediately apparent from listening to his show, is an extreme version of the "insult" genre of entertainment. Franklin is often loud, opinionated, rude, abrasive, obnoxious and insulting. In a manner reminiscent of the popular comedian Don Rickles, Franklin frequently hangs up on his callers and/or calls them insulting names.

The period when Stepien was the President of the Cavaliers, June 1980 to May 1983, is also the time period in which the alleged slander and emotional distress took place.

The appellant, after becoming President of the Cavaliers, immediately began an aggressive style of management that involved making numerous player transactions and staff appointments. The appellant went through more than fifty players and six coaches in two and one-half years, including the hiring and firing of one coach twice. This aggressive style of management and the lack of the Cavaliers' success thereafter resulted in appellant's receiving a great deal of unfavorable criticism in the press, nationally and locally.

The factual background specifically relevant to the alleged defamatory statements can be broken down into three general topics:

1. National Basketball Association's moratoriums on trading;
2. The finances of the Cavaliers; and
3. The proposed sale of the team and move to Toronto.

Many of Franklin's alleged defamatory statements complained of herein consisted of those that challenged the appellant's ability to manage an NBA team. These remarks by Franklin involved Cavaliers' player transactions and the league's subsequent reaction to them. In November 1980, the Cavaliers engaged in the above-stated trades that resulted in the team's trading away several first round draft choices. These trades were criticized by most observers and fans as being detrimental to the Cavaliers. In response, the NBA Commissioner imposed a restriction referred to as a "moratorium on trades" involving the Cavaliers. The restriction permitted the team to make trades, but only upon consulting with the league office and obtaining final approval. After a short while, the moratorium was lifted, but in February 1983, a second moratorium occurred. This restriction required the Cavaliers to give the NBA twenty-four hours to consider any trade and was apparently motivated by the NBA's concern that the Cavaliers' troubles might lead them to make unwise player transactions in order to raise operating capital. The Cavaliers' financial problems were acute. The appellant considered many options to alleviate this problem. Between January and April 1983, the appellant explored several possibilities including selling the team to out-of-town buyers, selling the team to a local buyer, or retaining ownership and moving the team to Toronto. During this period,

the media harshly criticized the appellant for not completing the sale and for proposing that the team move away from Cleveland.

There is no question that during the appellant's three-year period of ownership of the Cavaliers, Franklin was a harsh and critical commentator. His descriptions of appellant, extracted from tapes of the show provided to this court, include: "stupid," "dumb," "buffoon," "nincompoop," "scum," "a cancer," "an obscenity," "gutless liar," "unmitigated liar," "pathological liar," "egomaniac," "nuts," "crazy," "irrational," "suicidal," "lunatic," etc.

In May 1984, appellees filed a motion for summary judgment. After extensive discovery and pleadings, the trial court granted summary judgment on July 9, 1986, after considering the case for over a year. The trial court's forty-one page opinion granting summary judgment stated that all of Franklin's statements were protected opinions rather than defamatory factual statements. The opinion also stated that the discussion of sports-related issues on a sports show could not be sufficiently outrageous to provide a legal basis for a claim of intentional infliction of emotional distress.

The appellant appealed the judgment of the trial court and filed the following two assignments of error:

"1. The trial court erred in dismissing plaintiff's libel action because it failed to correctly apply the 'totality of circumstances' analysis.

"2. The trial court erred in dismissing plaintiff's claim for intentional infliction of emotional distress since reasonable minds could conclude that a three-year, near nightly verbal attack on plaintiff's intelligence, sanity, integrity, and veracity was extreme and outrageous behavior."

The first assignment of error calls upon this court to decide whether summary judgment was properly entered against the plaintiff in a public-figure defamation case. For the reasons which follow, we find that it was.

I

The law of defamation has been given much attention by the federal and state courts. We must begin our analysis with a brief examination of the standard which applies to the underlying defamation proceeding.

In *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, the United States Supreme Court set forth a standard which "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[2] *Id.* at 279-280. The proof of actual malice must be clear and convincing. *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323. In deciding if the proof is clear and convincing, the focus is upon the defendant's attitude toward the truth or falsity of the published statements, rather than upon the existence of hatefulness or ill will. *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 74; *Herbert* v. *Lando* (1979), 441 U.S. 153; *Cantrell* v. *Forest City Publishing Co.* (1974), 419 U.S. 245. The burden is on the plaintiff to show with convincing clarity that the publication of false statements was made with knowledge of their falsity, or with a "high degree of awareness of their probable falsity," *Garrison, supra,* at 74, or "that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 731. On appeal, the ap-

---

[2] Appellant admits he is a public figure in the context of *Sullivan.*

pellate court must exercise its independent judgment in deciding whether the evidence of the record meets these tests. *Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485, rehearing denied (1984), 467 U.S. 1267. This independent review of the records aids in protecting against " ' "forbidden instrusion[s] * * * [into] the field of free expression" ' " and assigns to judges a constitutional requirement that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge. *Id.* at 508 and 510.

On these basic principles, the law of Ohio and federal law are in accord. *Grau* v. *Kleinschmidt* (1987), 31 Ohio St. 3d 84, 31 OBR 250, 509 N.E. 2d 399; *Scott* v. *News-Herald* (1986), 25 Ohio St. 3d 243, 25 OBR 302, 496 N.E. 2d 699; *Dupler* v. *Mansfield Journal Co.* (1980), 64 Ohio St. 2d 116, 18 O.O. 3d 354, 413 N.E. 2d 1187, certiorari denied (1981), 452 U.S. 962.

## II

It is against the history of the First Amendment protection that a court review the summary judgment granted in favor of the defendants. *Perez* v. *Scripps-Howard Broadcasting Co.* (1988), 35 Ohio St. 3d 215, 218, 520 N.E. 2d 198, 201-202.

Neither this court nor the trial court may weigh the proof or choose among reasonable inferences in deciding whether summary judgment should be granted. As in other civil cases, inferences and questions of credibility must be resolved in plaintiff's (the non-moving party's) favor. *Dupler, supra.*

Nonetheless, summary judgment procedures are especially appropriate in the First Amendment area. " 'The threat of being put to the defense of a lawsuit brought by a popular public official may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself * * *. Unless persons * * * desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors. And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered." ' " *Dupler, supra,* at 120, 18 O.O. 3d at 357, 413 N.E. 2d at 1191. See, also, *Washington Post Co.* v. *Keogh* (C.A.D.C. 1966), 365 F. 2d 965, 968.

In order to withstand a defendant's motion for summary judgment in a defamation action, a public official-plaintiff must produce evidence sufficient to raise a genuine issue of material fact from which a reasonable jury could find actual malice with convincing clarity. *Bukky* v. *Painesville Tel. & Lake Geauga Printing Co.* (1981), 68 Ohio St. 2d 45, 22 O.O. 3d 183, 428 N.E. 2d 405. Moreover, only factual disputes that might affect the outcome of the suit under governing law will preclude the entry of summary judgment. *Anderson* v. *Liberty Lobby, Inc.* (1986), 477 U.S. 242.

In this case, appellant asserts that summary judgment was inappropriate due to the fact the lower court incorrectly applied the "totality of circumstances" analysis set forth in *Scott* v. *News-Herald, supra.* The *Scott* analysis uses four factors to determine whether a published statement is a constitutionally protected opinion or an actionable defamatory remark. The factors to be considered are:

1. The specific language used;
2. Whether the truth or falsity of the statement is verifiable;
3. The specific context of the statement; and

4. The broader social context in which the statement appeared.

Appellant asserts the trial court erred for two reasons. First, the trial court's general conclusions about the nature of the Sportsline audience are unsupportable in view of the substantial evidence in the record. Second, the statements have not been analyzed accurately with respect to their surrounding context. We disagreee.

The trial court, at the time of its decision, had no Ohio case law to detail guidelines for a trial court to follow in making a fact/opinion determination. The trial court found that the United States Court of Appeals for the District of Columbia had "devised a useful framework of analysis" in *Ollman* v. *Evans* (C.A.D.C. 1984), 750 F. 2d 970 (*en banc*). The *Ollman* analysis involved the same four factors as the *Scott* analysis. The *Ollman* court clearly stated that whether a statement is one of fact or opinion is a question of law for the court, not the jury, to determine, and is therefore an appropriate subject for summary judgment. *Id.* at 978.

This court finds, as the trial court found, that Franklin's comments were constitutionally protected opinion. As in *Scott,* the arena of sports is "a traditional haven for cajoling, invective, and hyperbole," and therefore the reasonable reader was on notice that this was a statement of opinion. *Scott, supra,* at 253-254, 25 OBR at 311, 496 N.E. 2d at 708-709. The appellant would have us believe that the statistical demographics of Franklin's audience is tantamount to deciding whether his remarks were defamatory. Again, if we are to have a free exchange of ideas, thoughts and discussion, we cannot place on a commentator the burden to protect against listeners who are not reasonable.

The First Amendment militates the protection of unrestricted and hearty debate on issues of concern to the public, including the protection of what "may well include vehement, caustic, and sometimes unpleasantly sharp attacks * * *." *New York Times Co., supra,* at 270. Since this court affirms the lower court's ruling that Franklin's remarks are constitutionally protected opinions, the actual malice standard need not be discussed.

## III

The appellant, in his second assignment of error, asserts that Franklin's intensive campaign of verbal harassment over a period of years caused him severe emotional distress.

In Ohio, it is necessary for a party alleging intentional infliction of emotional distress to establish that the alleged culpable conduct so exceeds the bounds of decency that it is considered atrocious, completely outrageous and utterly intolerable in a civilized community. *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 375, 6 OBR 421, 426, 453 N.E. 2d 666, 671.

Further, in determining whether conduct is culpable, Ohio courts have consistently recognized that it is essentail to view such conduct in context. There are situations naturally fraught with antagonism and emotion where a person must be expected to endure the resultant antagonism and mental anguish. *Local Lodge 1297* v. *Allen* (1986), 22 Ohio St. 3d 228, 22 OBR 407, 490 N.E. 2d 865.

In the cause before this court, the plaintiff is a public figure. Public figures, having thrust themselves into the public eye, cannot prevent others from criticizing or insulting them for their acts or deeds. *Scott, supra,* at 245-246, 25 OBR at 304, 496 N.E. 2d at 702. This is especially true when the public figure is a professional basketball team "owner" and the antagonism and criticism is from a member of the media.

Public figures who thrust themselves into the public eye must bear the discomfort of criticisms levied upon their public actions or statements. *Baumgartner* v. *United States* (1944), 322 U.S. 665. Stepien admitted he made many bold moves in his ownership of the Cleveland Cavaliers. Many of these moves caused heated disputes among fans, media, and the NBA. In this context, Stepien must expect critical commentary. Stepien also considered moving the team to Toronto. This speculative move was also highly controversial. Writers and fans cannot be expected to remain mute when "their" team might leave the Cleveland area. Having engaged in such conduct, the expected response was quite normal, although harsh.

The United States Supreme Court has recently set forth its opinion of intentional infliction of emotional distress in a public-figure context in *Hustler Magazine* v. *Falwell* (1988), 485 U.S. ___, 99 L.E. 2d 41, 108 S. Ct. 876.

In *Falwell*, a magazine published a parody which, among other things, portrayed Reverend Jerry Falwell as having engaged in a drunken incestuous rendezvous with his mother in an outhouse. Although the lower court found against Falwell on the libel claim, it ruled in his favor concerning the emotional distress claim. The court of appeals affirmed, rejecting Flynt's contention that the "actual malice" standard of *New York Times Co.*, *supra*, must be met before Falwell can recover for emotional distress. Rejecting as irrelevant the contention that, because the jury found that the parody did not describe actual facts, the parody was an opinion protected by the First Amendment, the court ruled that the issue was whether the parody's publication was sufficiently outrageous to constitute intentional infliction of emotional distress.

The Supreme Court held that in order to protect the free flow of ideas and opinions on matters of public interest and concern, the First and Fourteenth Amendments prohibit public figures and public officials from recovering damages for the tort of intentional infliction of emotional distress without showing in addition that the publication contained a false statement of fact which was made with actual malice. *Falwell*, *supra*, 485 U.S. at ___, 99 L. Ed. 2d at 49-50, 108 S. Ct. at 880.

Generally, the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most jurisdictions have chosen to make it civilly culpable where the conduct is sufficiently outragous. *Id.* at ___, 99 L. Ed. 2d at 50, 108 S. Ct. at 880. But in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. *Garrison* v. *Louisiana*, *supra* (379 U.S. 64).

In *Garrison*, the court held that a speaker is protected by the First Amendment even if the writer or speaker is motivated by hatred or ill will: "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Id.* at 73.

Thus, while a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, the court ruled the First Amendment prohibits such a result in the area of public debate about public figures. *Falwell*, *supra*, at ___, 99 L. Ed. 2d at 50, 108 S. Ct. at 881.

Appellee, Peter J. Franklin, commented about a public figure concern-

ing controversial situations. This court cannot award an emotional distress claim based on Franklin's ill will to Stepien. Therefore, assignment of error number two is not well-taken and the trial court's decision is affirmed.

*Judgment affirmed.*

NAHRA, C.J., and RIGGS, J., concur.

ROBERT B. WERREN, J., of the Court of Common Pleas of Harrison County; and ROLAND W. RIGGS II, J., retired, of the Court of Common Pleas of Washington County, sitting by assignment.