DICKERSON et al., Appellees,

v.

INTERNATIONAL UNITED AUTO WORKERS UNION et al., Appellants.

[Cite as *Dickerson v. Internatl. United Auto Workers Union* (1994), 98 Ohio App.3d 171.]

Court of Appeals of Ohio,
Cuyahoga County.

Nos. 65513 and 65543.

Decided Oct. 24, 1994.

172

C. *Douglas Lovett, Edward Miller* and *Dale Naticchia,* for appellees.

*Bobulsky & Grdina, Betty Grdina* and *Jay Whitman,* for appellant International Union, UAW.

*Allen & Hodgman, Bruce C. Allen* and *Blair Hodgman,* for appellant UAW Local 2262.

James M. Porter, Judge.

Defendants-appellants the International United Auto Workers Union (the "International") and United Auto Workers Local 2262 ("Local") appeal from jury verdicts and judgments in favor of four union members in the aggregate sum of $1.78 million. The plaintiffs recovered for intentional infliction of emotional distress allegedly caused by various union officials and members who intimidated and threatened the plaintiffs because they crossed the picket line and worked during a strike.

Defendant unions claim that the threats and intimidation were federally protected free speech; that the court permitted prejudicial hearsay from a police report; that their conduct was not outrageous or extreme; that the court improperly instructed the jury; that there was no psychological or medical testimony that the plaintiffs suffered severe and debilitating injuries; and that plaintiffs' counsel engaged in improper and highly prejudicial conduct which should have resulted in a mistrial. The International also claims it could not be liable for the Local's activities in the absence of evidence that it authorized, condoned, or ratified the conduct. For the reasons hereinafter stated, we reverse and enter judgment for the defendants-appellants.

In early 1991, about the time of the events leading to suit, Argo–Tech and Technautics were sister companies which jointly employed approximately eight hundred people. The companies had previously been part of TRW, and the employees had been represented by the Aircraft Workers Alliance. Argo–Tech split off from TRW in 1986, and Technautics split off from Argo–Tech in 1990. These reorganizations led to personnel cutbacks and labor unrest. A strike occurred when Argo–Tech split off from TRW in 1986. The following year, the workers voted out the old union and voted in the United Auto Workers Union. A new local, UAW Local 2262, was formed, and a new contract was negotiated that became effective from February 1, 1988 to January 31, 1991.

However, as the contract expiration approached in 1991, the union and company were divided on several issues. On January 17, 1991, the workers voted by secret ballot to authorize a strike effective February 15, 1991. On Sunday, February 17, by a stand-up vote, the membership voted to walk out, and the strike began the next morning.

The strike lasted six weeks, and picketing went on at four locations, twenty-four hours a day. There were no incidents of violence, no arrests, and no disciplinary action taken by the company against any employee.

Beginning in mid-March, both companies sent letters to their employees threatening to hire permanent replacements for striking workers. This was followed by telephone calls to employees who were at risk of losing their jobs.

A union meeting was held on March 22, 1991 to discourage any "back-to-work" trend. A feature of the meeting was that the volunteer strike captains stood around the walls of the room so they could be seen by and report to their picket groups. According to plaintiffs' witnesses, the strike captains urged the membership to stick together in an intimidating manner.

Several union leaders spoke directly to members who were thinking about crossing the picket line. Plaintiffs characterized these conversations as threats of physical violence as follows:

"(a) Strike captain Arch advised plaintiff Venable, 'If you go back to work you better hope no one knows where you live, and you better watch behind your back and watch in your rearview mirror.' On the day Venable first crossed the picket line, her mother and daughter each received an anonymous threatening phone call. Venable herself did not receive any calls and did not know who made the calls to her mother and daughter. However, because the person who called the mother said that Venable had better 'watch behind her and get herself some dogs', plaintiffs' counsel argued that both these calls came from the strike captain who had used similar language.

"(b) In response to a letter from plaintiff Kathy Sak stating she was going to cross the picket line, Local President James McTighe called her and commented that 'he could not say what 700 angry people were going to do if she crossed the line.' According to Sak, McTighe said the police could protect her on company property, but once she left company property she was on her own.

"(c) Joyce Dickerson had two similar conversations. On March 9, she told her picket captain, Ralph Sajewski, that if the company started to hire replacement workers, she would return to work to save her job. According to her, Sajewski replied, 'You go back in and you will get the hell beaten out of you.' She was not frightened by the remark and continued to picket with Sajewski for two more weeks. He did not threaten her again. On March 18, in response to an alleged phone call from a friend named Debbie Jones (who did not testify at trial but whose hearsay statement was admitted over objection) Dickerson called McTighe at the union hall and said, 'I understand you're going to come to my house along with a group of people and beat me up.' According to her, McTighe replied, 'Are you going to cross the picket line?' She became terrified and reported both this conversation and the earlier exchange with Sajewski to the police.

"(d) On March 19, 1991, when plaintiff Bill McCormick drove across the picket line to come to work, Glynn Douglas and another person approached his pickup truck. McCormick said, 'Are you going to do something to my truck?' Douglas answered, 'Yes, but it won't happen here.' Three months later, on July 10, 1991, Bill McCormick's wife parked his truck at a shopping mall twenty miles from

work.  After shopping, she noticed a substance, which McCormick testified was brake fluid, on the truck.

"(e) A second 'picket-line' incident occurred on March 21 as Joyce Dickerson was driving her car through the picket line with McCormick as a passenger.  A picketer named Danny Rittberger, who was not a strike captain and did not hold any union office, stood briefly in front of her car, 'gave her the middle finger' and called Dickerson a 'f------ [*sic*] bitch' stating 'I'll get you later.'  A videotape of this episode showed it lasted about five seconds.  Strike captains moved in and quickly removed Rittberger from the scene.  The tape showed the head of plant security, Mark Wagner, was standing right next to Rittberger when the incident occurred."

Some of the plaintiffs also received anonymous threatening phone calls on their answering machines, had litter strewn on their lawns, and had their vehicles 'keyed.'

Ultimately, sixteen of the eight hundred workers went back to work during the last few days of the strike.  In order to dispel rumors that many more workers had crossed the line, the union published the names of those who had crossed the picket line, *i.e.*, a "scab list."

A second piece of literature was also circulated among the union members during and after the strike.  It was called "Definition of a Scab," authored by Jack London back in the early union days.  It pungently portrayed a scab as the lowest form of life.  Plaintiffs contended these documents inflicted emotional distress on them directly and also linked the union with the other episodes of which they complained.

Plaintiffs testified that the harassment continued after the strike ended: the scab list and "Definition of a Scab" leaflet were circulated in the plant, and anti-scab graffiti appeared in the men's room;  however, there was no evidence the union authorized this graffiti, and the union requested the company to repaint the men's room, which was done.

About twenty T-shirts were brought into the plant by plaintiff John DeLuca.  These shirts said, "I would walk 10,000 miles to smoke a camel," a Gulf War slogan referring to killing Sadam Hussein.  Several workers changed the word "camel" to "scab."  These modified shirts distressed the plaintiffs, especially Etella Venable.

Other testimony related to a proceeding referred to as the "scab trial."  The Local notified the plaintiffs that union charges of "conduct unbecoming a member of the union" had been filed against them.  If found guilty, the plaintiffs could have been reprimanded, suspended, or expelled from the union.  Although a trial

committee was selected, no trial actually took place and was indefinitely post-poned.

Although the plaintiffs called no doctors or other psychological experts to testify, they nevertheless testified to paranoia, phobia, and behavioral changes caused by the foregoing events.

Plaintiff Venable claimed that she now varies her route to and from work, and parks in the driveway instead of the garage; she avoids driving through a parkway, since she fears that UAW members are hiding behind trees to shoot her; when she realized the UAW must have her address, she moved to a new, secret location within two weeks; prior to moving, she lived on the first floor and would not allow her two "children" (ages 23 and 24) to sleep with the windows open for fear UAW members would come through the windows. Both Venable and her daughter admitted contemplating moving anyway to a larger apartment. Venable also admitted having six different addresses in the last four years.

Venable has also developed a fear of crowds, since they may conceal UAW members seeking to harm her. In 1992, Venable's doctor told her she needed surgery for her sinuses. That night, she had a terrifying dream that she was in the hospital, screaming for police guards, for fear the union would come in and kill her.

Kathy Sak testified that the continual and constant harassment by her co-workers forced her to quit her job. The day she quit, she had discovered that someone had written graffiti on her equipment. She stated that she still feared the union even though she no longer worked with them, and testified she was afraid that the union was having her followed. She did not testify to any other phobia or behavior changes.

When Bill McCormick found that brake fluid had been poured on his truck three months after the threat, he no longer allowed his fourteen-year-old step-daughter out to play; he made sure the doors and windows of his home were locked; he kept three loaded guns in his house, including one which his wife kept loaded to protect against unidentified union agents who parked outside his house and spied through the drapes. (He admitted at trial that he no longer had the guns.) McCormick sleeps in the evening and stays awake all night for protection. McCormick has also had vivid nightmares involving the union.

For fear of UAW reprisals, Joyce Dickerson also sleeps with her windows closed, even in the summertime. She fears UAW members are hiding in her garage. She has purchased an automatic garage door opener to allow quicker entrances and exits. She closes the drapes to prevent people from looking into her home; she has also armed herself with a loaded .38 caliber revolver, which she now keeps under her bed.

Both union defendants filed motions for summary judgment against all plaintiffs, which were overruled on June 11, 1992. The case proceeded to trial on January 11, 1993. Trial began with a hearing on motions *in limine* filed by the defendants. The Local's motion requested that the court prohibit reference to twelve categories of evidence. The trial judge granted substantial parts of the motions. The trial lasted two weeks; twenty-five witnesses testified. Both defendants moved for a directed verdict at the close of the plaintiffs' evidence and at the close of all evidence. The Local moved for a mistrial on seven occasions following references to evidence previously ordered excluded. All these motions were overruled. On January 25, 1993, the jury returned the following verdicts:

"(1) In favor of Joyce Dickerson against both defendants in the amount of $730,000.00, with a recommendation for punitive damages against the International (plaintiffs did not seek punitive damages from the Local);

"(2) In favor of Kathleen Sak against both defendants in the amount of $390,000.00, with a recommendation for punitive damages against the International;

"(3) In favor of Bill McCormick against the Local only in the amount of $360,000.00, but in favor of the International;

"(4) In favor of Etella Venable against the Local only in the amount of $300,000.00, but in favor of the International;

"(5) In favor of both defendants against Dave Rivett and John DeLuca."

On February 3, 1993, the trial court held a hearing on the amount of punitive damages, and awarded $175,000 each to Joyce Dickerson and Kathleen Sak. Judgment was entered for these amounts on February 5, 1993. Both defendants filed motions for judgment n.o.v., a new trial, or an order of remittitur. These motions were overruled on May 7, 1993, and timely appeals ensued. The appeals were consolidated on June 2, 1993.

We shall first address the third assignment of error of both the Local and International together, as we find they are dispositive of the merits of this appeal.

"III. The trial court erred by overruling the Local's motions for summary judgment, directed verdict, and judgment n.o.v., since there was no properly admitted evidence of truly 'outrageous' conduct required to establish liability for intentional infliction of emotional distress." (Local.)

"III. The trial court erred in refusing to grant the [International's] motion for summary judgment, directed verdict and jnov because the elements of the tort were not established with constitutionally or other legally sufficient evidence." (International.)

We find that the merits of defendants' appeals turn on (1) whether or not the unions engaged in extreme and outrageous conduct beyond all possible bounds of human decency; and (2) whether or not the plaintiffs produced sufficient evidence to establish that they suffered serious mental distress, to wit, severe and debilitating anguish of a nature that no reasonable person could be expected to endure. Regardless of whether the challenged evidence was admissible or not, we find it does not support an action for intentional infliction of emotional distress.

The essential elements that plaintiffs must prove to establish a claim of intentional infliction of emotional distress are summarized as follows by this court in *Ashcroft v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 359, 366, 588 N.E.2d 280, 284:

"A claim for intentional infliction of serious emotional distress requires proof of four elements:

"' * * * 1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," Restatement of Torts 2d (1965) 73, Section 46, comment d; 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it," Restatement of Torts 2d 77, Section 46, comment j.' *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66, 463 N.E.2d 98, 103."

In attempting to define what constitutes extreme and outrageous conduct, Ohio has adopted Sections 46(1) and (2) of the Restatement of Law 2d, Torts (1965), and the comments thereto as standards to be used in deciding emotional distress cases. *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 374-375, 6 OBR 421, 426, 453 N.E.2d 666, 671-672, the case in which the Ohio Supreme Court first recognized the tort at issue, quotes Comment *d* of the Restatement in describing the standard:

" '[It] has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally the case is one in which the recitation of the facts to an

average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

" 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. * * * ' " Followed in *Reamsnyder v. Jaskolski* (1984), 10 Ohio St.3d 150, 153, 10 OBR 485, 487, 462 N.E.2d 392, 394; *Ashcroft v. Mt. Sinai Med. Ctr., supra,* 68 Ohio App.3d at 366, 588 N.E.2d at 284; *Pyle v. Pyle* (1983), 11 Ohio App.3d 31, 34, 11 OBR 63, 66, 463 N.E.2d 98, 103.

The conduct must also be viewed in context to determine what is "beyond all possible bounds of decency * * * and utterly intolerable in a civilized community." As this court has previously noted:

"Ohio courts have consistently recognized that it is essential to view such conduct in context. There are situations naturally fraught with antagonism and emotion where a person must be expected to endure the resultant antagonism and mental anguish." *Stepien v. Franklin* (1988), 39 Ohio App.3d 47, 51, 528 N.E.2d 1324, 1330.

In addition to the foregoing authorities, we are obliged to follow the Supreme Court decision in *Local Lodge 1297 v. Allen* (1986), 22 Ohio St.3d 228, 22 OBR 407, 490 N.E.2d 865, which bears striking similarities to the case at bar. In *Local Lodge 1297,* the union sued to recover fines imposed against union members for crossing the picket line and returning to work during a lawful strike. The strikebreakers were subjected to several incidents of property damage and repeatedly called "scabs" by union officials and union members. The strikebreakers counterclaimed for intentional infliction of emotional distress.

■ In drawing the fine line between federally protected and tortious language, the Ohio Supreme Court relied on United States Supreme Court authorities and stated as follows:

" * * * Thus, although *Linn v. United Plant Guard Workers* (1966), 383 U.S. 53 [86 S.Ct. 657, 15 L.Ed.2d 582], held that federal labor law does not completely pre-empt the application of state laws to libels published during labor disputes, such state tort actions simply cannot be founded upon use of language which is federally protected, such as the epithet 'scab.' In the words of the court: '[i]t

should be clear that the newsletter's use of the epithet "scab" was protected under federal law and cannot be the basis of a state libel judgment. * * * To be sure, the word is most often used as an insult or epithet. But *Linn* recognized that federal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point.' *Old Dominion [Branch No. 496, Natl. Assn. of Letter Carriers, AFL–CIO v. Austin* (1974), 418 U.S. 264], at 282–283 [94 S.Ct. 2770, 2780–2781, 41 L.Ed.2d 745, 761]. In *Farmer v. United Brotherhood of Carpenters & Joiners* (1977), 430 U.S. 290, 305–306 [97 S.Ct. 1056, 1066, 51 L.Ed.2d 338, 353], the court further observed that ' * * * [t]he potential for undue interference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts. * * *'

" * * * Certainly, appellees must be required to endure the use of language which enjoys federal protection. Therefore, we hold that although the National Labor Relations Act does not pre-empt a state's recognition of causes of action for intentional infliction of emotional distress or invasion of privacy, neither cause of action may be predicated on the mere use of federally protected language in the context of a labor dispute. See *Farmer, supra.*" *Id.,* 22 Ohio St.3d at 230, 22 OBR at 408–409, 490 N.E.2d at 867–868.

Although the *Local Lodge 1297* counterclaimants argued that the case involved more than an issue of pure speech and was coupled with frequent threats and property damage, the court found that the "overwhelming majority of testimony * * * involve[d] use of the federally protected epithet 'scab' [and there was] no direct evidence which link[ed] the union to that [property] damage, [or] which show[ed] that the union or its officers authorized, condoned, or ratified such incidents of actual property damage." *Id.* at 231, 22 OBR at 409, 490 N.E.2d at 868.

■ In the instant case, there is no question that the plaintiffs' counsel made liberal use of the federally protected word "scab" in the testimony of various witnesses, *i.e.,* Jack London's "Definition of a Scab," the "scab list" and the "scab trial," to mention a few. Although the trial court entered an order *in limine* excluding such references, this exclusionary ruling seemed to go "by the boards" as the trial progressed. Nevertheless, in its instructions to the jury, the trial court charged that use of "scabs or bitches of itself doesn't constitute and may not be considered by the jury as the basis for injury or holding liability against the union or any person who actually utilized these words." A presumption exists that the jury has followed the instructions given to it by the trial court. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 195, 559 N.E.2d 1313, 1322; *State v. DePew* (1988), 38 Ohio St.3d 275, 284, 528 N.E.2d 542, 553. It is problematic,

however, whether that charge was sufficient to cure the negative connotations associated with the use of the language. *Bruton v. United States* (1968), 391 U.S. 123, 129, 88 S.Ct. 1620, 1624, 20 L.Ed.2d 476, 481.

■ The anonymous phone calls and property damage (*i.e.*, brake fluid poured on truck; vehicles keyed; litter strewn on lawn) are likewise not actionable, "as appellees have provided no direct evidence which links the union" to such actions. *Local Lodge 1297, supra*, 22 Ohio St.3d at 231, 22 OBR at 409, 490 N.E.2d at 868.

Quite aside from the "scab" rhetoric, anonymous phone calls and property damage, which are not legally actionable in the case herein for intentional infliction of emotional distress, we must consider the other evidence which the plaintiffs label threats of "death or serious bodily harm," and defendants characterize as "mere threats," "good advice," or "warnings" designed to encourage the plaintiffs to honor the picket line.

■ The language of which complaint is made may be construed as veiled threats, *i.e.*, if you go back to work, "you better hope no one knows where you live, and you better watch behind your back and watch in your rearview mirror * * * and get herself some dogs"; "he could not say what 700 angry people were going to do"; "you go back in and you will get the hell beaten out of you"; "are you going to do something to my truck—yes, but not here"; "I'll get you later."

Arguably, most of these remarks would come under the "innocent construction rule" described by Justice Douglas, concurring, in *Local Lodge 1297*, 22 Ohio St.3d at 235, 22 OBR at 413, 490 N.E.2d at 871. If the statements are susceptible of two constructions, one tortious and one innocent, the unions are entitled to the "innocent construction." The defendants argued throughout the trial that these statements were primarily realistic advice, *i.e.*, plaintiffs did risk the wrath of seven hundred angry people, the union could not guarantee their safety, and they better look out for their own welfare. In other words, these remarks could be construed as mere warnings or reminders that the plaintiffs were foolishly inviting retribution from their fellow union members. Whatever the merits of the "innocent construction" proposition, we do not choose to rest the disposition of this case on such a slim precedential ground.

We do find that even placing the worst possible construction on the various exchanges between the plaintiffs and union officials, they amounted to nothing more than "the type of robust language and clash of strong personalities" which are commonly found in any bitter strike activities. *Farmer v. United Bhd. of Carpenters* (1977), 430 U.S. 290, 306, 97 S.Ct. 1056, 1066, 51 L.Ed.2d 338, 354. See, also, *Linn v. United Plant Guard Workers of Am., Local 114* (1966), 383 U.S. 53, 58, 86 S.Ct. 657, 660–661, 15 L.Ed.2d 582, 587 ("Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be

deemed actionable *per se* in some state jurisdictions. * * * [They] are frequently characterized by bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions."). They do not amount to "atrocities" beyond "all possible bounds of decency" and "utterly intolerable in a civilized community." These kinds of clashes, name calling, and threats are as old as the union movement itself and have been going on for decades at the principal point of conflict—the picket line. Indeed, the verbal confrontations at issue here were momentary, unaccompanied by rational fear of immediate physical harm, and initiated by the plaintiffs; nothing significant came of any of the supposed "threats"; and, they were typical or even mild in the "uncivilized" community of a bitter strike scenario.

The plaintiffs themselves admitted they were not alarmed by most of the incidents. Etella Venable admitted she "didn't think much of [Bill Arch's watch behind your back] comment at the time," and that she was "never personally threatened by anyone." Bill McCormick admitted that during the entire course of the strike, he was "never directly threatened, just warned." Joyce Dickerson admitted she was "not afraid at the time" when Sajewski made his statement to her on the picket line about getting the hell beaten out of her, passing it off as an "idle threat." Sak was never threatened on the picket line, but quit her job over "scab" graffiti and the oppressive "silent treatment" from her fellow union members when the strike was over.

As this court has previously emphasized, these incidents must be viewed in context. Plaintiffs testified they were frightened of losing their jobs; the unions were determined to protect the integrity of their picket line and the solidarity of their membership. Tension was bound to run high, nerves were frayed, and tempers were on edge. This was a situation "fraught with antagonism and emotion," where plaintiffs must be expected to endure a certain amount of conflict and stress. *Stepien, supra; Local Lodge 1297, supra.* Compare *Vance v. Consol. Rail Corp.* (Nov. 10, 1993), Cuyahoga App. No. 63806, unreported, at 13, 1993 WL 462871 (In a negligent infliction of emotional distress claim under the FELA, "the conduct displayed by the evidence might be viewed as 'unconscionable' or 'outrageous' in a more delicate setting but it is hardly unexpected or shocking in the railroad yard."). The ambiguity of the threats depicted by the evidence here did not attain the level of extreme or outrageous conduct in the context of picket-line confrontation or labor strife.

■ Furthermore, we hold that even if the comments directed at the plaintiffs did cause them to suffer emotional distress, the unions are not liable, since the claimed injuries were not severe and debilitating or those with which a reasonable person, normally constituted, would be unable to cope adequately.

The Supreme Court has provided the legal definition of "serious emotional distress" in *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph 3(a) of the syllabus:

"Serious emotional distress describes emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case."

The court went on to state that:

"A non-exhaustive litany of some examples of serious emotional distress should include traumatically induced neurosis, psychosis, chronic depression, or phobia. * * *

"* * * [A] court may decide whether a [plaintiff] has stated a cause of action by ruling on whether the emotional distress alleged is serious as a matter of law.

"* * *

"We also observe that with respect to questions of proof, expert medical testimony can assist the judicial process in determining whether the emotional injury is indeed serious. *Schultz [v. Baberton Glass Co.* (1983), 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109], *supra.* However, lay witnesses who were acquainted with the plaintiff may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred. * * *" (Footnote omitted.) *Id.* at 78, 80, 6 OBR at 119, 121, 451 N.E.2d at 765, 767.

We also find that the fleeting tensions, confrontations and events would not have caused a reasonable person to react as these plaintiffs did. Comment *j* to the Restatement of the Law 2d, Torts, Section 46 states:

"The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge."

As this court stated in *Lynn v. Allied Corp.* (1987), 41 Ohio App.3d 392, 401, 536 N.E.2d 25, 35:

"While it may have been reasonably foreseeable Mrs. Lynn would become upset, when she was initially informed about the opportunity to elect early retirement, it was not reasonably foreseeable Mrs. Lynn would be incapable of coping with the situation and suffer severe mental distress as a result. A 'reasonable person, normally constituted' would not react in this manner."

■ There is no clear proof that the threats which might be considered actionable had any immediate or traumatic impact on the plaintiffs involved, nor was there any medical testimony to that effect.

A strike captain told plaintiff Dickerson and another union member that they would get the hell beaten out of them if they crossed the picket line. Dickerson took this as an "idle threat" at the time and did not call the police for more than two weeks. She then told the prosecutor she did not want Sajewski prosecuted, just warned.

Dickerson called Jim McTighe and stated that she had heard she would be harmed if she crossed the picket line; in response, he asked her if she intended to cross the line. Despite this "threat," she crossed the picket line.

As she drove across the picket line with Bill McCormick, a union member, Danny Rittberger said to her, "You f------ [sic] bitch, I'll get you later," and gave her the finger. The chief security officer of the employer was standing right there, and the picket captain escorted Rittberger away from the scene. She also heard about her name appearing in obscene or threatening graffiti in the plant men's rooms, but did not observe this graffiti herself.

Although claiming to be severely and permanently distressed by these incidents, Dickerson never saw a doctor, psychiatrist, or psychologist, nor did she call as witnesses one friend or family member to verify her claim of severe emotional distress.

Kathy Sak's award was based on evidence that Jim McTighe told her "he could not say what 700 angry co-workers would do if she crossed the picket line." She did not report this call to the police; she merely asked Cecil Moore to talk to McTighe about it. Litter was also strewn on her front lawn a few days after the strike was settled. She testified the threat of a scab trial upset her and also upsetting was the fact that fellow workers would no longer look at her. After work one day a group of men followed her to her car and called her a "f---ing [sic] scab." In October 1991, someone put some graffiti on her work equipment, so she quit her job. Although she stated she was still afraid of the union and feared they were following her, she too never saw a physician, psychiatrist, or psychologist and called no lay witnesses to support her claim.

Bill McCormick was in the car when Rittberger made the obscene gesture to Joyce Dickerson. On a different occasion, he asked Glynn Douglas if Douglas was going to damage his truck. Douglas said, "It won't happen here." In July 1991, three months after the strike, someone poured brake fluid on his truck in a shopping center twenty miles from work. The second day of McCormick's crossing the picket line, someone keyed the gas tank of his motorcycle. No one threatened McCormick himself with physical harm.

McCormick testified that he suffered severe psychiatric symptoms caused by these events. He claimed to suffer recurrent horrifying nightmares about the UAW over the summer of 1991. He took a four-month medical leave of absence the following summer, and he was six weeks into another medical leave at the time of trial. Unlike the others, McCormick testified on direct examination that he was under the care of a psychologist and a psychiatrist because of the union. The psychiatrist prescribed two strong psychoactive drugs, Prozac and Dudspar.

■ McCormick admitted he had been under the care of a doctor prior to the strike, who had prescribed Inderal, a drug capable of causing hallucinations and vivid dreams. He was taking this very drug at the time of his nightmares. Despite this medical history, no expert testified that McCormick's distress was caused by the union activities, rather than his pre-existing conditions and medications. Over objection, he was permitted to testify that his psychiatrist told him that he prescribed Prozac "due to depression, stress-related, due to what I was going through with the union." This was improper. See *Holman v. Grandview Hosp. & Med. Ctr.* (1987), 37 Ohio App.3d 151, 157, 524 N.E.2d 903, 910 (diagnosis of depression may not be introduced by hearsay).

Etella Venable was never threatened herself, although Arch told her he hoped no one knew where she lived and to watch behind her back. Two family members received anonymous phone calls the first day she went back to work; nothing happened to Venable personally before or after those phone calls. Like McCormick, Venable has a prior psychiatric history. She consulted three different psychiatrists prior to the strike. In 1989, she took a leave of absence for six months for "psychological counselling." Yet she has not seen a doctor since the strike and missed no time from work. Although her daughter testified to her mother's behavioral changes, Venable's mother testified that she had seen no significant change in Venable's personality. No expert was called to verify that Venable's present fear of crowds and paranoia about assassins behind trees were attributable to the union rather than her preexisting psychiatric conditions. Venable herself was permitted to testify that her psychiatrists had not previously diagnosed her as suffering such disorders.

In this case where plaintiffs claimed such sweeping and continuing disruption of their lives due to overwhelming fear of the union, expert testimony was essential to establish causation. In *Grote v. J.S. Mayer & Co.* (1990), 59 Ohio App.3d 44, 47, 570 N.E.2d 1146, 1149, the court upheld summary judgment against a plaintiff suing for negligent infliction of serious emotional distress, where plaintiff offered no expert testimony, and the plaintiff's claim "involved proof of mental distress, and its cause, of a medically significant nature that exceeded the capability of a jury of non-professionals to reasonably understand and evaluate."

Although it was essential that plaintiffs prove severe and debilitating psychic injury to sustain their claim, no expert evidence was offered to show that it was the actionable episodes that caused these subjective complaints as opposed to the federally protected conduct of the union members.

Nevertheless, plaintiffs maintained they would continue to suffer emotional distress into the future: "in a case involving a subjective injury, expert medical testimony is needed to prove future pain and suffering or permanency." *Jordan v. Elex, Inc.* (1992), 82 Ohio App.3d 222, 231, 611 N.E.2d 852, 857.

While expert testimony may not be an absolute necessity in every case, many Ohio courts have dismissed claims by plaintiffs who never sought medical assistance for alleged emotional distress. *Davis v. Billow Co. Falls Chapel* (1991), 81 Ohio App.3d 203, 208, 610 N.E.2d 1024, 1027; *Plikerd v. Mongeluzzo* (1992), 73 Ohio App.3d 115, 126, 596 N.E.2d 601, 608; *Putka v. First Catholic Slovak Union* (1991), 75 Ohio App.3d 741, 751, 600 N.E.2d 797, 803; *Kurtz v. Harcourt Brace Jovanovich* (1990), 69 Ohio App.3d 267, 273, 590 N.E.2d 772, 776; *Sheets v. Rockwell Internatl. Corp.* (1990), 68 Ohio App.3d 345, 355, 588 N.E.2d 271, 277; *Jones v. Washington* (1990), 67 Ohio App.3d 176, 180–181, 586 N.E.2d 228, 231–232. Requiring substantial proof of the claimed mental disturbance helps alleviate policy concerns surrounding the recovery for emotional distress. As the United States Supreme Court recently stated in *Consol. Rail Corp. v. Gottshall* (1994), 512 U.S. ——, ——, 114 S.Ct. 2396, 2405, 129 L.Ed.2d 427, 441:

" 'Because the etiology of emotional disturbance is usually not as readily apparent as that of a broken bone following an automobile accident, courts have been concerned * * * that recognition of a cause of action for [emotional] injury when not related to any physical trauma may inundate judicial resources with a flood of relatively trivial claims, many of which may be imagined or falsified * * *.' The incidence and severity of emotional injuries are also more difficult to predict than those of typical physical injuries because they depend on psychological factors that ordinarily are not apparent to potential tortfeasors."

Although the court stated the above in reference to negligent infliction of emotional distress, the same policy concerns of determining the severity of the disturbance and possibility of fraud exist with intentional infliction of emotional distress. It stands to reason if plaintiffs' emotional distress was severe and debilitating they would have sought medical assistance or psychological counsel or therapy to relieve unendurable conditions.

"A trial court may determine whether a complainant has stated a cause of action for tortious emotional distress by ruling whether the emotional injury alleged is serious as a matter of law." *Kurtz,* 69 Ohio App.3d at 273, 590 N.E.2d at 776. Thus, a number of cases have rejected similar complaints as not causing severe or debilitating emotional distress. See, *e.g., Gagne v. Northwestern Natl.*

*Ins. Co.* (C.A.6, 1989), 881 F.2d 309 (sleeplessness, withdrawal and "not the same person she was" is not of sufficient severity); *Jones v. Washington* (1990), 67 Ohio App.3d 176, 586 N.E.2d 228 (recurring nightmares did not constitute showing of sufficient psychic injury); *McCarthy v. Cleveland Hts.* (1989), 65 Ohio App.3d 216, 583 N.E.2d 981 (depression requiring psychological counselling following son's suicide was not sufficiently severe); *Lynn v. Allied Corp.* (1987), 41 Ohio App.3d 392, 536 N.E.2d 25 (distraught and hysterical feelings, crying, and elevated blood pressure not sufficiently serious). We hold that the phobia, paranoia, nightmares, and other abnormal behavior were not severe and debilitating and would not have occurred to persons normally constituted.

Our decision today should not be interpreted as imposing no limit on union comments and threats in the midst of a labor dispute. On the peculiar facts of this case, we are holding that while plaintiffs were subjected to an unpleasant, hostile, and nerve-wracking situation, the evidence before us did not reach the level of "extreme" and "outrageous" conduct beyond the capacity of a reasonable person to endure in civilized society. This is especially true given the use of federally protected language, plaintiffs' immediate reaction to the alleged threats, and plaintiffs' failure to prove severe and debilitating emotional harm.

For the reasons hereinbefore contained, we find that the trial court should have sustained defendants' motion for directed verdicts and jnov, since plaintiffs did not establish the essential elements of their case by showing extreme and outrageous conduct or proving severe and debilitating mental distress for which the law affords relief.

The International's and Local's third assignments of error are sustained.

Since the disposition of the foregoing assignments of error moots the other assignments of error (contained in the Appendix hereto), it is not necessary to address them. App.R. 12(A)(1)(c).

Judgment reversed; judgment entered for defendants.

*Judgment reversed.*

SPELLACY, P.J., and HARPER, J., concur.

## APPENDIX

Local 2262's assignments of error:

"I. The trial court erred by permitting the plaintiffs to prove their case, over objection and in deliberate violation of the court's own order in limine, on the basis of expressive activity that is plainly protected under the First Amendment to the Constitution of the United States, and concerted activity plainly protected or preempted by federal labor law.

"II.   The trial court erred by permitting the plaintiffs to establish crucial elements of their case by means of patent hearsay, unauthenticated documents, the unsworn testimony of plaintiffs' counsel, and repeated, deliberate references to matters properly excluded by the pre-trial order in limine.

"III.   The trial court erred by overruling the Local's motions for summary judgment, directed verdict, and judgment n.o.v., since there was no properly admitted evidence of truly 'outrageous' conduct required to establish liability for intentional infliction of emotional distress.

"IV.   The trial court erred by giving jury instructions which understated the necessity for proof of outrageous conduct, and overstated the extent of a union's vicarious liability.

"V.   The trial court erred by failing to grant a remittitur or new trial, since the total verdict of $1.78 million * * * was clearly excessive in the absence of (1) any medical confirmation of plaintiffs' disabling fears and (2) any objective basis for those fears."

International Union's assignments of error:

"I.   The trial court erred in refusing to grant the defense motion for summary judgment, the motions for directed verdict, and the motion for jnov, where the agency liability of the International was never established as a matter of law.

"II.   The trial court erred in failing to instruct the jury on the federal standards of union agency liability and, instead, incorrectly instructed the jury on general standards of respondeat superior liability and joint-several liability, which do not apply to unions in tort claims arising out of labor disputes.

"III.   The trial court erred in refusing to grant the motion for summary judgment, directed verdict and jnov because the elements of the tort were not established with constitutionally or other legally sufficient evidence.

"IV.   The trial court erred in denying the motion for directed verdict and submitting the issue of punitive damages to the jury and denying the motion for jnov, where there was no legally sufficient evidence of malic [*sic*].

"V.   The trial court erred in denying the motion for jnov concerning the claims of Kathy Sak since there was no prayer for relief made on her behalf as required by Rule 54(C)."